## No. 6548.

MARY D. COOPER ET AL. VS. SAMUEL C. CAPPEL ET AL.

Co-trespassers are liable *in solido*.

The husband may and should sue in his own name, to enforce any right of his wife, except when the wife exclusively administers her own property, or when the ownership of some dotal or paraphernal effect, or real right of hers is involved. A joinder of the wife will be treated as mere surplusage.

In a suit for damages on account of a trespass the trouble and expense the plaintiff
  has been illegally put to are to be considered in estimating the damages. At-
  torney's fees are a part of such expense, and may be proved, even when they have
  not been specifically alleged.
The attempt of a lessee, or his vendee, to forcibly remove from the leased premises,
  property subject to the lessor's privilege, is a trespass, sounding in damages.
An irregularity in the method of returning a verdict by a jury, which does not in-
  jure any of the parties, will not vitiate the verdict.

APPEAL from the Ninth Judicial District Court, parish of Rapides.
Orsborn, J.  Trial by jury.

R. J. Bowman, for plaintiffs.

Robert P. Hunter, for defendants.

The opinion of the court was delivered by

MARR, J.  This is an action by husband and wife to recover damages
for alleged wrongs to person and to property.

The petition charges substantially, that on the sixteenth of February,
1876, the defendants came to the gin on the premises of petitioners and
forcibly and violently took and carried away seven bales of cotton, be-
longing to the wife and in her possession at the time.  That this cotton
was raised on the plantation of the wife by one of the defendants,
Joseph D. Bass, who was indebted to her in the sum of six hundred and
twenty dollars for rent, and left with her this cotton, on which she had
the lessor's lien and privilege.

That defendants came to the gin with two wagons, and one of the num-
ber threatened to kill Silas H. Cooper, the husband, who resisted the
taking of the cotton by them; that one of them shot at and assaulted
him, and two others of them held him while the others took possession
by force and violence, placed the cotton on the wagons, and carried away
and converted it to their own use.

That the cotton was worth fifty dollars a bale; and that petitioners,
by the violent invasion of the premises, and the disturbance of their
peace and security, as well as by the assaulting of the husband and the
lawless deprivation of their property, have been damaged in the sum of
six thousand dollars, for which they pray judgment against defendants
in solido.

Defendants excepted on the grounds—that the petition discloses no
cause of action; that it is too vague and indefinite; that there is a mis-
joinder of parties; and that defendants can be brought into court only
by separate suits against each individually.

These exceptions are simply frivolous.  The petitioner charges with
sufficient distinctness and clearness such wrongs, both to person and
property, as form the basis of civil actions for reparation in damages,
and of public prosecutions for the insult and injury to the peace and
dignity of the State under all civilized governments.

The word "jointly" was used improperly in the English text of article-

Mary D. Cooper vs. Cappel.

2304 of the Civil Code by mistranslation of the corresponding word, "*solidairement,*" in the French text. This article was amended by the act of 1844, page fourteen, so as to make the English text agree with the French text, and since the passage of that act there has been no room for question that co-trespassers are liable *in solido.* Article 2324 of the Revised Code, which takes the place of article 2304 of former editions, uses the words "*in solido*" instead of "jointly," in accordance with the act of 1844.

These exceptions were properly overruled, and defendants immediately filed others, which should have been disposed of in the same way:

First—That there is a misjoinder of plaintiffs; that the wife sues for the value of seven bales of cotton, and vindictive damages, while the husband sues exclusively for vindictive damages for the attack upon his person and the injury to his feelings.

Second—That an action for vindictive damages must be based upon or grow out of actual damages.

Third—That the district court was without jurisdiction, because the action is based upon the wrongful taking of seven bales of cotton, alleged to be of value less than five hundred dollars.

First—It may be true that the plantation leased to Bass belonged to the wife as alleged, but it is not alleged that the wife was separate in property, nor that she administered her paraphernal property separately and alone. We can not assume that to be true which is not necessarily so, and which is neither alleged nor proven. Most wives re y upon their husbands to manage their affairs, and this is so consonant with the trust and confidence which should ever exist between husband and wife that we would presume it to be true in every case in the absence of allegation and proof to the contrary. C. C., article 2385 (2262).

The fruits of paraphernal property administered by the husband or by husband and wife indifferently belong to the conjugal partnership if there be a community of gains. C. C., article 2386 (2363). And rents are civil fruits. C. C., article 545 (537).

Community is a consequence of marriage where there is no stipulation to the contrary. C. C., article 2399 (2269). And this community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact. C. C., article 2402 (2371).

Husbands may proceed in their own names to enforce the possessory and personal rights of their wives. It is only where the wife administers her paraphernal property separately and alone, or where the ownership of the dotal or paraphernal property or some real right belonging to her is involved that suit must be brought in her name, with assistance of her husband or the authorization of the judge. C. P., article 107.

Actions for personal wrongs to the wife or for injury to her paraphernal

property not administered separately and alone by her should be brought in the name of the husband alone, because the damages recovered would fall into the community, of which he is head and master and sole administrator. C. C. 2404 (2373). But as this court said, in Barton vs. Cavanaugh, which was a suit by husband and wife for the malicious arrest of the wife, " the joinder of the wife does not destroy the action, and it may be regarded as surplusage." 12 An. 333.

If it had been alleged in this case that plaintiffs were not in community, or that the wife administered her paraphernal property separately and alone, and that trespassers entered upon her premises and assaulted and beat or otherwise maltreated the husband while he was endeavoring to protect her rights and her property, we see no good reason why they might not unite in a single action against the wrong-doers and recover the aggregate of the damages proven by them respectively. The lawless invasion of the rights and property of the wife would be aggravated by the violence done to the husband while endeavoring to protect and defend them, as his duty required; and the assaulting and maltreatment of the husband would be aggravated by the injury done simultaneously to the rights and property of the wife.

We have no doubt the allegations of the petition would authorize an action by the husband in his name alone; but the joinder of the wife, where she is not a necessary party, may be treated as surplusage, and it can not in any respect prejudice the right of recovery.

Second—If by *actual damages* pecuniary loss is meant, and the intention is to assert that an action can not be maintained for violence done to a man while endeavoring to protect property lawfully and peaceably in his possession, because it does not belong to him, and he does not allege loss to himself of money or of property, the proposition is not true in law, and the tendency and consequences of such a doctrine would be most mischievous.

Third—It is certainly a new idea, and one which we can not sanction, that, in an action for assaulting and shooting at a man, and for taking forcibly and violently and carrying away property which was lawfully in his possession, whether in his own right or in right of another, the measure of damages is the value of the property.

These exceptions were referred to the merits. They have no foundation in law, and they should have been overruled absolutely.

Three of the defendants, Matthews, Amos, and Pierre, pleaded a general denial, the two others, Cappel and Bass, answered separately. Cappel, after the general issue, avers that he bought the cotton from Bass in good faith for a valuable consideration. That Bass represented to him that he had paid the rent. That Bass had leased the premises and the gin-house from Mrs. Cooper, and was holding over, in his posses-

sion as lessee, until he could gin and remove the crop made by him; and that he entered the premises after the purchase of the cotton, *bona fide,* and in company with Bass, for the sole purpose of accepting the delivery of the cotton from Bass, at his request, and in pursuance of the sale. He denies that the cotton was ever delivered to or in the actual possession of Mrs. Cooper or of her husband and agent, Silas H. Cooper. He denies that she ever had *jus in re,* and alleges that her claim on the cotton was only *jus ad rem,* which was imperfect, and gave her a right of action only.

He denies that he ever disturbed the peace or security of Mrs. Cooper; he denies that the loss of seven bales of cotton can be made the basis of an action for damages for six thousand dollars, so as to give the court jurisdiction, and he expressly reserves his peremptory exception to the jurisdiction.

Bass pleads the general issue; and he specially avers that he leased the premises for the year 1875 from plaintiffs, and was, at the time set forth, holding over in his possession of the land and the gin-house; that he never delivered the seven bales of cotton to either of the plaintiffs in payment of rent or other claim; that he sold the seven bales to Cappel for a price agreed upon, and that he went with Cappel and wagoners for the purpose of delivering the same to Cappel upon the premises, of which he was still in possession; and that he did then and there deliver the same to Cappel.

The case was submitted to a jury on these pleadings; and a verdict rendered against defendants, *in solido,* for one thousand dollars in damages. From the judgment rendered on this verdict both parties appealed; and the plaintiffs have answered the appeal taken by defendants, and pray that the judgment be so amended as to allow them six thousand dollars.

Five bills of exception were taken by defendants, which we shall dispose of before entering upon the merits:

First—Defendants objected to the admission of testimony to prove injury to the feelings of plaintiffs, and attorney's fees as part of the damages, on the ground that the only specific sum claimed as damages was the value of the seven bales of cotton; that defendants having excepted to the jurisdiction plaintiffs could not prove any amount of damages to give the court jurisdiction. They also objected that plaintiffs had not claimed attorney's fees, and they could not be permitted to prove more than they claimed.

The court admitted the testimony on the ground that the cause of action is an offense against the person and property of plaintiffs; and the fees of attorneys, the value of the property, and the injury to the feelings of the plaintiffs might all be the subject of inquiry in the assessment of damages.

In a case like this there is no basis upon which the damages can be fixed with absolute certainty; and the jury may well consider the trouble and expense to which the plaintiffs have been subjected by the wrongful act of defendants; and it is proper for them to take into the account, as part of the expense, the reasonable fees of attorneys. See Dyke vs. Walker, 5 An. 521, 522. The suit is for damages, and not for attorney's fees; and it was not necessary to claim the attorney's fees specifically in order to let in the proof as an element of damages.

The objection on the ground of want of jurisdiction is altogether unfounded. Where the jurisdiction depends on the amount in controversy the sum demanded determines the question; and the amount sued for in this case is six thousand dollars.

Second—Under an agreement, counsel for plaintiffs introduced the testimony of two witnesses, who were not present, taken in writing on the preliminary trial of the case of the State vs. Cappel and others, to which defendants objected on the ground that it was *res inter alios;* and that the agreement only related to such witnesses as were present and subject to cross-examination.

The court correctly ruled that the admission of the testimony was in accordance with the agreement between the parties, as entered on the minutes.

Third—Counsel for defendants read to the jury and commented on the case of Black vs. Carrollton Railroad Company, 10 An. 33, and asked the court to charge the jury in the language used by Chief Justice Slidell in that case, p. 44. The bill of exceptions states that the court refused to give the charge. The judge says he did not so refuse. That he told the jury all the law read by defendant's counsel was good law, but that the case was different from that at bar, and the decision read was not applicable. He told the jury, however, that they were the judges of the law and the facts.

It is most remarkable that the judge did not tell the jury that the language which the counsel for defendants desired him to tell them was the law, and applicable to the case, was that used by one member of the court in his dissenting opinion; that it was not the language of the court; that the majority of the court decided that it was not law in that case, and that it had no application whatever to the case they were trying.

Fourth—The court charged the jury that the lessor may take the effects upon the leased premises, and keep them until he is paid; that his lien is as valuable to him as if he were the owner of the property itself; and not even a sheriff or marshal can take away the property before paying the lessor his rent.

This charge is almost in the very words of the Civil Code, article 3185,

Mary D. Cooper vs. Cappel.

and of this court in Robb vs. Wagner, 5 An. 112, and Arick vs. Walsh, 23 An. 605, 606. As there was no seizure by sheriff or marshal, the judge had no special occasion to refer to them, but what he says might well be stated to the jury, *arguendo*, to show the wrong done by the defendants in depriving the plaintiffs of property by force which even the sheriff or the marshal could not take away under legal process without paying the rent.

Fifth—The case was submitted to the jury Saturday evening about five o'clock, and the court adjourned until Monday morning. On Sunday morning at ten they notified the judge, through the sheriff, that they had agreed upon a verdict, and they came into the court-room, accompanied by the sheriff, and handed their verdict to the judge, which was read aloud to them, and which they, each and every one, stated was their verdict. The judge told them they might be discharged from the confinement of the jury-room, but that they must return Monday morning and render their verdict, which they did in open court, and which they again declared was their verdict.

All these proceedings were in the presence of the counsel for defendants, and the verdict which was handed to the judge and which was read on Sunday is the same which was rendered on Monday in open court.

When the court adjourned Saturday evening the judge might have told the jury, in case they agreed, to return a sealed verdict. It seems he did not do this. Where the jury return a sealed verdict it is handed to the clerk, but it is not easy to perceive any good reason why, in a civil case, if the judge should be willing to repair to the court-room, the jury might not, in presence of the parties or their counsel, hand to the judge their verdict in writing, on Sunday, and be discharged from the confinement of the jury-room. The publicity given to the verdict, the signature by the foreman, the reading it aloud, and having the declaration of each and every juror that that was the verdict, afforded ample security against any subsequent alteration, and this seems to us equally as safe as the delivery of a sealed verdict to the clerk. If the proceeding in the case was irregular, it certainly was nothing worse, and it in no manner prejudices either party to the cause, nor can it vitiate the verdict.

Joseph D. Bass leased the plantation of Mrs. Cooper for one year, ending January, 1876, for $700. He remained on the place for the purpose of gathering the crop, good part of which he shipped to market. On the twenty-fifth of January he and Cooper made a settlement, and Bass made out, in his own writing, and signed a statement showing balance due by him for the rent, $620 40, "for which my entire crop is bound until satisfied."

Bass left the place on that day, twenty-fifth of January, 1876, and Cooper permitted him to take away his personal effects, including two mules and a horse, leaving, to pay the rent, the cotton that was in the field, which Cooper had picked by hands hired and paid by him.

On the sixteenth February, when this cotton was passing through the gin and being put into bales, Bass returned and superintended the work. About five o'clock in the evening he left and went to the store of Cappel, about one mile from the gin, and there, in the presence of persons who seemed to have been called to witness the transaction, he sold to Cappel the seven bales, the entire remainder of his crop, at eight cents a pound, city weights, which means simply that Cappel was to ship the cotton to New Orleans and to allow Bass for so many pounds as the cotton might be found to weigh at New Orleans.

There was no money paid, and none was to be paid. Bass owed Cappel, and was to be credited with the amount in account.

Immediately on the closing of this transaction, Cappel, his clerk, Matthews, Ralph Amos, and Zeddo Pierre got on the two wagons which belonged to Curry, the uncle of Cappel, and which had arrived from Evergreen at an early hour in the day, and set out for the gin on the Cooper place, accompanied by Gillmore Curry and Bass on horseback, to receive delivery of the cotton, and to remove it from the premises. On the way, between Cappel's store and the gin, they passed the shop of Odom, about sunset. Matthews and Cappel called to Odom to get his pistol and go with them, which Odom, did and his brother accompanied them.

After the Odoms got on the wagon, Cappel told one of them, who testified on the trial, that they were going to have some fun. They were going to Cooper's to get some cotton. That Joe Bass was to do the fighting, as he had his pistol and his brass knuckles on; that Cooper had some eight or nine armed negroes at the gin and "says we shan't have that cotton." He then drew his pistol, and said with an oath, "If I get among them I'll make them scatter," and he handed his pistol to Odom to look at, which he did, pronounced it all right, and returned it to Cappel.

About this time, and as they were approaching the gin-house, Odom jumped off the wagon and Gillmore fell behind. Cappel and Bass headed the party and led the wagons into the gin-lot or inclosure in which the gin-house stood, and turned them round near the gin-house.

Cooper inquired of Cappel what his business was. Cappel said he had come for two bales of cotton belonging to one Griffin, also a tenant of Mrs. Cooper, and he offered to pay the rent due by Griffin. Cooper asked Cappel why he had brought two five-mule teams to take away two bales of cotton, and Cappel then informed him that he intended to have all the cotton there. Cooper said he could not do that, that the

cotton belonged to his wife; if he took it he must take it by force, and that he would be robbing an innocent woman. Cappel, addressing Bass, said: "Joe, Mr. Cooper says this is his cotton." Bass answered, "It is no such thing, for I made the cotton, and I turn it over to you." Cappel then said, "If that's the way it is, put it in the wagon, boys."

About this time Cooper and Cappel were near together, and there is some proof that Cooper took Cappel by the shoulders and shook him. Cooper drew, or had in his hand, a small derringer. Cappel drew his revolver, aimed it directly at Cooper, and threatened to kill Cooper if he did not put up his derringer. Curry, who up to this time had remained on his horse, jumped off and struck down Cappel's arm, so that his pistol was lowered and the ball missed Cooper. Cappel struck at Cooper with his pistol, and either the blow knocked him down, or he stumbled and fell. Curry, the uncle, and Matthews, the clerk of Cappel, immediately laid hands on Cooper, and took him off and held and detained him in spite of his resistance and struggles, while the cotton was put upon the wagons, and until Cappel left, followed by the loaded wagons.

Curry and Matthews say they held Cooper to prevent his shooting Cappel or Cappel shooting him, but no one held Cappel. Cooper insisted on their releasing him, and Curry said he would if Cooper would give up his pistol. Cooper said he wanted to go where Cappel was. Curry said he might if he would surrender his pistol. About this time Odom came up and interposed, and told Curry he ought to let Cooper have his pistol, to which Curry answered, "If you have any business to attend to you had better do it."

Cappel corroborates Odom fully with respect to the preparation he had made for a fight. He says:

"When we were on the wagons I heard that there were some seven or eight negroes at the gin-house, and I showed my pistol to Mr. Odom, and said if I got after them with it I would make them scatter if they interfered with me."

He says, on cross-examination: "The cause of the row was because Mr. Cooper would not let me take the cotton, and pulled a pistol on me. The cause of the row was because Mr. Cooper resisted me in my attempt to take the cotton, which he said belonged to his wife, and because he pulled a pistol on me."

It is sufficiently proven that Cappel knew from Cooper's statements to him, on the Saturday before the sixteenth of February, that Bass had not paid the rent, for Cooper told Cappel he would give one hundred dollars to any one who would take the cotton and pay the rent due by Bass.

The pretense that Bass was holding over and was in possession under the lease, and that he could give authority to enter the inclosure and

take away the cotton, is idle. Bass should have gathered the cotton and have ginned it, so as to have made it available to Cooper for the rent, and his presence at the gin-house on the sixteenth, for the purpose of baling the cotton, was not unlawful, because it was with Cooper's consent. But in no sense was he a lessee holding over on the sixteenth of February, after having left the premises, moved off, on the twenty-fifth of January. The entire party, all the defendants, were simply trespassers and violators of the rights of possession and of property when they left the road with their wagons and drove into the gin-house inclosure.

Cappel paid no money for this cotton. He and Bass and Matthews testify that Bass owed him more than the value of the cotton, as they say, for advances and supplies to make the crop, and Bass wanted Cappel to have the cotton, because Cappel promised to advance to enable him to make another crop. Cappel had not recorded any privilege for the debt due by Bass ; and the property, the cotton, was on the leased premises, in possession of the lessor. There is no room to question the right of the lessor to keep and retain this property until the rent was paid ; and this right was superior to any right which Cappel had or could have acquired.

Cappel knew that Cooper would not give up the cotton willingly. He knew that before he left the store. It was not necessary to go with eight others, armed, to receive delivery of seven bales of cotton from the owner. But Cappel told Odom that Cooper "says we shan't have this cotton ;" and there was apparent necessity for him to go in force when he knew that Cooper either had or professed to have superior rights and claims to it, and had also the courage and manhood to assert his rights, and to attempt to maintain them.

What Cooper did after Cappel had, with his co-trespassers, entered the premises and Cappel had ordered the boys to put the cotton on the wagons, notwithstanding the remonstrances of Cooper, and his repeated declarations that Cappel would have to take it by force, and that he would be robbing an innocent woman, it is not material to inquire. Far be it from us to encourage or sanction by any word of ours violence or a resort to force to vindicate rights which may be enforced through the machinery of the law, but we deem it not improper to say under all the circumstances of this case, if Cooper had killed Cappel he would have incurred no criminal responsibility ; while if Curry had not at the critical moment struck down Cappel's arm he would in all probability have been guilty of one of the highest crimes known to the law—murder—while engaged in a lawless violation of the right of property.

There was, beyond doubt or question, a lawless combination, a conspiracy, a pre-arrangement by the defendants, to go to the gin-house at a late hour—it was after sunset when they left the store, getting dusk when

they reached the gin-house—to take and carry away the cotton by force, by the use of deadly weapons, firearms, provided in advance, if Cooper could not be overawed and the anticipated resistance repressed by numbers and by bluster.

Such lawlessness must be repressed, must be put down by the strong hand of the law, and wrong-doers must be taught that "the way of the transgressor is hard." It is only when the laws are enforced and obeyed, when rights are observed and respected, and when the citizen can feel that he is secure in his person and property so long as he does no wrong to others, that there can be peace, good order, and prosperity in the land.

We have searched the record in vain for one single mitigating circumstance. An old grey-headed man, as Odom describes him in his testimony, a "functionary of the Methodist Church," as Cappel calls him in his answer, an itinerant preacher of the gospel, while peaceably engaged at work on the premises of his wife, is assaulted, shot at, held forcibly by two men while others of the same party take and carry away property which he claims in behalf of his wife, and which two of the chief trespassers knew was subject to her right of pledge as lessor. Comment would but weaken the force of the simple statement of the facts.

We consider the case one which eminently requires exemplary damages, and it affords a fit occasion to give warning to the lawless and the violent that they are not to expect leniency at the hands of the judicial tribunals. If the jury had given the full amount of damages sued for, we should not have disturbed the verdict; but the amount awarded is wholly inadequate. We gather from the record that the grand jury of Rapides parish have dealt with this matter, and that fact may have influenced the jury in their assessment. It shall have all the effect with us to which we think it entitled.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended, and that plaintiffs recover of defendants, *in solido*, the sum of three thousand dollars with costs in both courts.