135 So.2d 91 (1961)
Lake LAFLEUR, Plaintiff-Appellant,
v.
Oscar SYLVESTER, Jr., Defendant-Appellee.
No. 394.
Court of Appeal of Louisiana, Third Circuit.
November 6, 1961.
Rehearing Denied November 29, 1961.
*93 Preston R. Aucoin, Ville Platte, for plaintiff-appellant.
Fruge & Foret, by J. Burton Foret, Ville Platte, for defendant-appellee.
Before CULPEPPER and HOOD, JJ., and W. W. THOMPSON, District Judge, retired, Judge ad hoc.
THOMPSON, Judge ad hoc.
In this action plaintiff, Lake Lafleur, couples a demand to be decreed the owner of a certain farm implement, called a McCormick Manure Spreader, which he alleges defendant stole and converted to his own use, when he trespassed upon plaintiff's land by unlawfully entering the same and taking the implement away with him, with an action for damages for said illegal trespass and conversion.
The defendant, Oscar Sylvester, Jr., generally denying plaintiff's allegations, affirmatively alleges his own ownership of said farm implement, and alleging that plaintiff, in co-conspiracy with defendant's ex-wife, himself, illegally converted said implement to his, plaintiff's own possession and use, seeks judgment, in reconvention decreeing him to be the owner of said implement and for damages against plaintiff for the alleged conversion of the manure spreader and for the reason that plaintiff alleged that he, defendant, "stole" that implement.
The District Court, for written reasons assigned, rendered judgment decreeing defendant to be the owner of the chattel in question, but holding defendant guilty of trespass, awarded judgment against him and in Plaintiff's favor for what he called "nominal damages" in the sum of $250 with legal interest from January 12, 1961, until paid and all costs of both courts.
Plaintiff prosecuted this devolutive appeal from that part of said judgment that failed to grant him the relief for which he prayed in his original petition.
Defendant did not appeal, but did answer plaintiff's appeal, and prayed that:
1. The judgment appealed from be reversed and plaintiff's suit be dismissed at his costs.
2. There be judgment in his favor and against plaintiff as prayed for in respondent's reconventional demand.
3. In the alternative that the amount of $250.00 awarded by the judgment of the lower Court, be reduced to $25.00, and as thus amended, the judgment be affirmed and appellant be condemned to pay the costs incurred in both Courts.
The specific damages claimed by plaintiff, as itemized in his petition, are as follows:

*94
1. Value of property converted
 (if not ordered returned to
 petitioner by the Court ---------------- $ 200.00
2. Damages for wrongful conversion ------- 2,000.00
3. Humiliation, mental anguish
 and embarrassment ---------------------- 2,000.00
4. Trespass on property ------------------- 1,000.00
5. Attorneys' fees ------------------------ 2,000.00
6. Loss of use of implement --------------- 150.00
 _________
 Total ----------------- $7,350.00

In his brief in this Court the Attorney for plaintiff assigns as errors committed by the lower court the following, to-wit:
In not holding that:
1. Plaintiff, Lafleur, was the true and legal owner of the manure spreader in question.
2. Defendant, Sylvester, committed the tort of wrongful conversion, in addition to committing the wrongful entering and trespass.
3. Plaintiff, Lafleur, was entitled to the damages prayed for in his original petition.
The facts, as we believe them to be disclosed by the record, are as follows:
Defendant, Oscar Sylvester, Jr., and his wife, Lola Sylvester, were judicially separated by judgment of the 13th Judicial District Court of Evangeline Parish, Louisiana, on October 27, 1958. On October 30th, 1958, they entered into an amicable partition of a portion of the assets belonging to the community of acquets and gains theretofore existing between them. The partition was evidenced by an authentic act, executed by them on October 30, 1958, filed in evidence, marked for identification as "P-D-1", and appears at page 24 of the transcript.
The Sylvesters now contend that he (she) was awarded the manure spreader under the terms of the Act of Partition and it is out of that contrary contention that this controversy arises. Mr. Sylvester bought the implement in December, 1957, and placed it on the "home place", that is the 80 acre tract where their home was, and where they had cattle, barns and a pasture. A manure spreader is constructed much in the form of a small two-wheeled wagon with some cultivation attachments on it, and is designed for the purpose of gathering and spreading manure. This spreader, after being placed on the home place by Mr. Sylvester, in December, 1957, remained there and was used for the service and improvement of that place, and was used also on other of his places, but was still located on the "home place" on the date of the partition, October 30, 1958. According to Mrs. Sylvester, the spreader was then in one of the barns on that part of the home place that she thereafter leased to Mr. Sylvester.
In the act of partition is described first the items of property that were awarded to Mr. Sylvester. The various items are described in 24 separately numbered paragraphs and are mostly real properties, but No. 15 (Tr. 28) reads as follows:
"15. All of the movable equipment, including tractors, bulldozers, etc., except a 1956 Cadillac and a 1956 Chevrolet pick up truck and a 1954 Tractor with lawn mower".
After describing, in paragraph 24, the last of the items transferred to Mr. Sylvester, the act then proceeds to describe, in lettered paragraphs "A" through "U", those properties that were transferred to Mrs. Sylvester. The "home place" is described in Paragraph lettered "N", as follows:
"N. A certain tract of land together with the home and all of the buildings, contents and improvements, furniture, fixtures, linens and contents whatsoever therein contained and thereunto belonging, located thereon and thereto appertaining, containing eighty (80) acres, more or less, located in irregular Section Fifty-one (51) etc., etc., * * *". (There follows reference to the deeds under which title to the place had been acquired.)
*95 As we construe the instrument, the intention of the parties was that, with the 80 acres of land, there was transferred to Mrs. Sylvester the home and all other buildings thereon and their contents, and improvements, the furniture, fixtures, linens therein contained and everything located on the land and appertaining thereto. Since the manure spreader was, at the date of the act of partition, as it had been since it was acquired and placed thereon in December, 1957, located on said 80 acre tract and used for the service and improvement thereof, except as it was occasionally used on some of the other farms owned by Mr. Sylvester, we think it was conveyed to Mrs. Sylvester under the plain terms of the act of partition.
In this connection Mr. Sylvester testified that he also used the manure spreader on others of the several farms that he owned, but the fact remains that it was placed on the home place when it was purchased and used thereon for its service and improvement. And thereafter every time its location is mentioned in the record, it is on the 80 acres comprising the home place. Mrs. Sylvester testified it was on the home place at the time of the partition, October 30, 1958. (It was purchased December 3, 1957.) When she sold the home place, the manure spreader was still there and she moved it, with her other farm implements to a barn located on a 15 acre tract she had reserved from the sale of the home place. During the year and a half they lived together subsequent to the first separation, Mr. Sylvester used the manure spreader, as he did the other implements located in the barn on the home place, just as he had always done, but after the second separation, according to Mrs. Sylvester, he did not use them, including the manure spreader, and the spreader stayed under the barn. Mrs. Sylvester said that if Mr. Sylvester rented the spreader to anyone after the separation, it was without her knowledge. Mr. Vidrine testified on March 22, 1961, that he rented the spreader for a week "last Spring" from Mr. Sylvester which would make it in the Spring of 1960. The Sylvesters separated October 30, 1958 and she testified they went back together three months later, which would make it about the last of January, 1959. She said they then lived together a year and a half before the second separation which would fix this separation the latter part of July, 1960, but Mr. Sylvester said the second separation occurred in March, but didn't fix the year. As a matter of common knowledge, wives are better at remembering such dates as weddings, anniversaries, birth dates, etc. We don't know whether that would hold true as to the marital separation dates, but we think the wife could be better depended upon, under ordinary circumstances to remember the date that she and her husband separated than would the average husband. So we will accept July, 1960, as the date of the second separation. Hence, when Mr. Sylvester rented the manure spreader to Mr. Vidrine in the Spring of 1960, the Sylvesters were living together although the community of acquets and gains had not been re-established. Be that as it may, after the partition was made, Mrs. Sylvester leased to Mr. Sylvester, the pasture part of the 80 acres comprising the home place and the manure spreader was in a barn on the part he leased because he said he continued to use it. In other words, at all times, after the machine was purchased and by the owner placed on the 80 acre tract, comprising his home place, the domicile or home of the manure spreader seemed to remain on that home place and was unquestionably there when, in the act of the partition Mr. Sylvester transferred to Mrs. Sylvester the 80 acres comprising the home place and everything located thereon or appertaining thereto. And even though he might have used it on some of his places, on occasion, we don't think that, after its status was once fixed as part of the immovable of the 80 acre home place, by establishing it as an immovable by destination, that the fact that it might have been occasionally used elsewhere would have had the effect of demobilizing it. It seems clear to us that it was conveyed to *96 Mrs. Sylvester under the terms of the above quoted description contained in paragraph "N" of the Act. We think that the conveyance of everything located on the home place as set out in said Paragraph lettered "N" was a specific description that modified that general description "All movable equipment" contained in Paragraph 15.
It is a rule of construction of contracts, that unless a contrary intention appears from the contract as a whole, the meaning of general words will be restricted by more specific terms or descriptions of the subject matter to which they apply. Where, however, both general and special provisions may be given reasonable effect both are to be retained. C.J.S. Verbo "Contracts" Vol. 17, Sec. 313.
The Louisiana cases cited in support of that text are these: P. Olivier & Son v. Board of Com'rs of Lake Charles Harbor and Terminal District, 177 La. 157, 148 So. 12; Mixon v. St. Paul Fire & Marine Ins. Co., 147 La. 302, 84 So. 790; In Re Liquidation of Mitchell-Borne Const. Co., 145 La. 379, 82 So. 377.
But there is another, and, perhaps, even more cogent reason for holding that the manure spreader was transferred to Mrs. Sylvester by the act of partition, and that reason is this: It had unquestionably become attached to the 80 acres "home place" as an immovable by destination and being such, it was transferred with that realty. It was bought by Mr. Sylvester and by him, who also then owned the "home place", placed thereon for its service and improvement and was located thereon at the date of the act of partition.
We quote the pertinent parts of Article 468 of the Revised Civil Code of 1870, as follows:
"Things which the owner * * * has placed upon it (his land) for its service and improvement, are immovable by destination.
"Thus the following things are immovable by destination when they have been placed by the owner for the service and improvement of a tract of land, to wit:
"Cattle intended for cultivation.
"Implements of husbandry."
and such movable as the owner has attached to the buildings are likewise immovable.
The instances given in the Article are merely illustrative and not restrictive. Breaux v. Ganucheau, 3 La.App. 481; Scovel v. Shadyside Co., 137 La. 918, 69 So. 745; Morton Trust Co. v. American Salt Co., 5 Cir., 149 F. 540.
In 1953, the Supreme Court, in Smith v. Bell, 224 La. 1, 68 So.2d 737, with Mr. Justice Hamiter writing the opinion, construed a deed containing a description of property much like the one in the instant case. In the Smith case, Smith had sold to Bell "a certain piece or parcel of land or plantation, together with the buildings and improvements thereon, and all the rights, ways, privileges and appurtenances there-unto belonging or in anywise appertaining (except as hereinafter reserved)." The reservation was of a gin house and ½ of the minerals. About fourteen months later, Smith sued Bell claiming Bell had converted certain farm implements, he, Smith, had left on the place, asserting that it was understood between them that those implements were not included in the sale. Quoting Article 468 of the Code and rejecting plaintiff's demands, the Court held:
"Considered alone the notarial act of May 11, 1950, sufficiently evidenced a transfer to defendant of the contested farm implements and equipment, and this plaintiff seems to concede. Those articles, at the time, were located on the conveyed plantation for its service and improvement; their status was that of immovables by destination; and they were not excepted or reserved from the sale. As said in LSA-Civil Code, Article 468: (The article is then quoted). Again, LSA-Civil Code, Article 2461 states: `The sale of a thing includes that of its accessories, and of whatever has been destined for *97 its constant use, unless there is a reservation to the contrary.'"
Counsel for defendant-appellee, in his brief in this Court, contends that the case of Smith v. Bell has no application here, because the instrument construed in that case was a sale or deed, whereas the act in this case was an act of partition. We fail to distinguish the difference. The fact is that in the act of partition, here construed, one of the parties, in consideration of the transfer and sale to him of the other's half interest in the property described, sells, conveys and transfers to the other his half interest in the same property.
We think it will have to be admitted that the instrument we are called upon to construe, the act of partition, is ambiguous. It is capable of being understood in either one of two or more ways. The very fact that the Judge of the District Court understood the instrument's provisions in one way and we understand it in another strongly indicates that it is capable of being understood in either one of two or more ways.
We agree with the District Judge's observation, made in his reasons for judgment, that there was admitted in evidence some testimony that was inadmissible. For instance, we don't think attorneys at law, called as experts, are permitted to state their legal opinions as to the legal construction that should be placed upon a written instrument.
"The authentic act (which the act of partition was) is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared and proved a forgery." LSA-C.C. art. 2236.
"Neither shall parole evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since". LSA-C.C. art. 2276.
Attorneys may be called as legal experts and testify as to what the law of another state or foreign country is, but "The opinion of an attorney as to the legal effects of a document is not admissible." C.J.S. Vol. 32 Evidence § 532, page 234. Plaintiff called one of the attorneys who had represented Mrs. Sylvester in conferences leading up to the execution of an act of partition and who had confected or assisted in its confection and the attorney who had acted as the Notary Public, before whom the instrument was executed, to give their expert opinions as to the legal effect of the act and they were permitted, over defendant's objection, to do so. Their testimony, for such purpose, should have been excluded and we do not consider it, although we acknowledge having the greatest respect and regard for the legal opinions of these so eminent and distinguished members of the Bar, and realize, full well, that their opinions would be of great help to us in arriving at the correct solution of the problems we are called upon to decide.
But the defendant, as plaintiff in reconvention, having charged Mr. Lafleur and Mrs. Sylvester with fraud, in that they conspired to deprive him of the manure spreader, the parol testimony given by Mrs. Sylvester and her attorneys, that she did seek and obtain their advice, and hers and Mr. Lefleur's testimony that she communicated that advice to Mr. Lefleur, was admissible to refute Mr. Sylvester's charge of fraud and to prove the good faith of Mr. Lafleur in purchasing the manure spreader from Mrs. Sylvester and her good faith in selling it to him.
While, in the absence of fraud, error, etc., in the making of an agreement evidenced by a written act, parol evidence is not admissible to change, alter, or contradict its written provisions, where words in a deed are ambiguous and the parties thereto by their acts, have given a practical construction thereto, such construction may be resorted to in aid of arriving at the intention of the parties. Abadie v. Lee Lumber Co., 128 La. 1014, 55 So. 658.
*98 In this connection, it should be noted that after the execution of the act of partition, on October 30, 1958, the chattel in controversy was left in the possession of Mrs. Sylvester, on land that was transferred to her in the act and remained in her possession or under her dominion for approximately two years, or until about three weeks before October 15, 1960. It is true as above pointed out, that for about one and one-half years of that period, Mr. and Mrs. Sylvester were living together as man and wife and he was permitted to use the farm implement, the manure spreader, but with Mrs. Sylvester's consent and permission, the community of acquets and gains not having been re-established when they went back together about three months after the first separation in October, 1958. If they then lived together a year and a half and then separated again, it must have been in July, 1960, when they separated the second time and again the manure spreader was left on her land and in her possession and completely under her dominion and under her control, from the date of that separation until she sold it to Mr. Lefleur. Mr. Sylvester owned other farms and cattle and testified that he needed the spreader on some of those also as well as at the home place. We think his leaving the chattel in Mrs. Sylvester's possession, on her land, his failure to claim it as his, all during this period, places his own interpretation on the act of partition and strongly argues that he knew he did not own the spreader. He offers no explanation of why, on the first separation, he did not then move the spreader to one of his own places, nor, on the second separation, he did not do this. Mr. Sylvester, judging from his testimony, does not impress us as a man who would be so careless about where he leaves his personal property.
It appears significant also that when Mr. Sylvester learned that Mr. Lefleur had the manure spreader and telephoned Mr. Lafleur upon being told that Mr. Lafleur had bought the implement from Mrs. Sylvester for $200.00, he exclaimed not "That's my property", or "She couldn't sell my spreader" or anything to indicate he claimed the ownership thereof, but did exclaim "Oh, God, $200.00 for that manure spreader". Obviously the price rather than the ownership was what was at the moment highest in Mr. Sylvester's mind.
In the brief of counsel for defendant-appellee, filed in this Court, it is stated, on page 4:
"Certainly the manure spreader in question was an immovable by destination. The question to be resolved by this Court is whether or not a manure spreader used on farms of the owner in various parts of the Parish, but stored on one particular piece of property, becomes an immovable by destination on the place where it is stored and occasionally used, or whether it becomes an immovable by destination on all of the various farms and pieces of property on which it is used".
Counsel cites no authority in support of his view that this manure spreader was an immovable by destination, on each of the farms, including the home place, on which it was used.
When once this implement of husbandry was purchased by the owner of the home place and placed thereon for its service and improvement, its status as an immovable by destination became established and it became a part of the realty of that 80 acre tract of land. It must be assumed that Mr. Sylvester was aware of that fact, and there is nothing in the record to indicate that he, thereafter, made any intended attempt to change that status. As has been hereinbefore pointed out, on every occasion when we have any definite information as to its location we find it on the home place, the 80 acre tract acquired by Mrs. Sylvester, with everything appertaining thereto. After a movable has become immobilized by destination, the mere change of mind on the part of the former owner cannot, of itself, demobilize it as against a purchaser or mortgagee without notice. Scovel v. Shadyside Co., Ltd., 137 La. 918, 69 So. 745. We believe and hold that once the movable, this manure spreader, status as an immovable *99 by destination had been fixed as part of the realty, the 80 acre tract, it did not become demobilized by its occasional use by the owner on some other of his farms. We think it remained a part of the 80 acre home place and was transferred with that place to Mrs. Sylvester in the act of partition. But should the view of counsel for appellee be accepted, and it be held that the chattel had become an immovable by destination on each of the farms on which it had been used, including the "home place", Defendant-Appellee could not profit from such a holding, because it is not disputed that the implement was actually located in one of the barns on the home place, when the act of partition was executed, and that being true, and it being conceded that it was an immovable by destination on that place, it was transferred, as part of the home place to Mrs. Sylvester. Counsel's contention in the respect mentioned is without merit.
Sometime after the execution of the act of partition, on October 30, 1958, in which Mrs. Sylvester acquired the home place, with all the buildings and everything that was on it or appertained to it, she sold the place, reserving 15 acres of it and found it necessary to remove from it her farm implements, etc. She moved them onto the reserved 15 acres, near where the Sylvester's son lived and stored them in a barn thereon. She said some of these tools or implements began disappearing and she asked Mr. Sylvester to bring them back which he didn't do, thus indicating that she thought he was the one who was removing them. In fact, she named two of the implements as having been taken by Mr. Sylvester, a portable "cattle shoot" and a "bush hog". When Mr. Sylvester was on the stand, he attempted no explanation of the charge made against him by Mrs. Sylvester when she was on the stand. Mrs. Sylvester testified she leased a part of the home place, a pasture, to Mr. Sylvester, and he used the tools as he had before the separation during the time they lived together but did not use them after the second separation. It seems, then, that from the date of the act of partition, October 30, 1958, for the three months before they resumed their marital relations, the manure spreader was exclusively in Mrs. Sylvester's possession on the home place which went to her with the act of partition. For the year and a half during which they lived together before the second separation, the implement remained on the home place, but was used by Mr. Sylvester, obviously with Mrs. Sylvester's permission, on the part of the home place (pasture) he had leased from her and used it when he wanted to use it on other places as well. But again, after the second separation and for several months elapsing between the date of the second separation and the time Mrs. Sylvester let Mr. Lafleur have the spreader, it again remained in her possession on the home place and was not, during that period, used by Mr. Sylvester.
We are not only of the opinion that the manure spreader, as an immovable by destination, was conveyed to Mrs. Sylvester, by the plain terms of the Act of Partition, itself, but we also believe that Mr. Sylvester's actions in leaving the implement with the home place, which he had conveyed to his wife for these several periods of months, indicated that his own understanding was that the manure spreader belonged to Mrs. Sylvester, and consequently, she had the right to sell it.
After Mrs. Sylvester's farm implements began disappearing, subsequent to her sale of her home place, she decided to sell the implements also. Her son, who worked with Mr. Lafleur, the plaintiff, at some sort of nearby plant, informed Mr. Lafleur that his mother had some farm tools for sale and asked him about buying the manure spreader. Mr. Lafleur asked the son why they didn't sell it to the boy's "Daddy" (Mr. Sylvester), since he needed one, but the son said they didn't want to sell anything to his Daddy since his Daddy had been giving his mother so much trouble. That conversation contains another circumstance tending to indicate that the Sylvester's son didn't know that his father claimed the ownership of the manure spreader, because the *100 excuse he gave Mr. Lafleur for not selling to Mr. Sylvester was because they didn't want to sell anything to his Daddy because of the trouble the Daddy had been giving his Mother. Finally Mr. Lafleur agreed to and did go see the manure spreader and offered to buy it from Mrs. Sylvester for $200.00. But, because, as she testified, that her farm implements had been disappearing and Mr. Sylvester wouldn't bring them back, she decided that before selling this implement she would check with her attorney as to her legal right to sell it. However, pending her checking with her attorney, and because she was afraid that the manure spreader would also disappear if left on the place, she suggested that Mr. Lafleur take the implement on a loan basis, agreeing that she would inform him later, as soon as she had talked with her attorney, whether she could make the sale. Mr. Lafleur took the implement and carried it to his place and about three weeks later Mrs. Sylvester telephoned him and told him that her attorney said the spreader was hers and she had the right to sell anything that belonged to her. So on that very day, October 15, 1960, Mr. Lafleur gave Mrs. Sylvester his check for the $200.00. (See exhibit P-2, Tr. 37.) Sometime after that, probably early in January, 1961, Mr. Sylvester wanted to use the manure spreader and couldn't find it. His son informed him that Mrs. Sylvester had loaned it to Mr. Lafleur. According to Mr. Sylvester, he telephoned Mr. Lafleur and thinking that Mrs. Sylvester had loaned the spreader to Mr. Lafleur he told Mr. Lafleur "Lake I would like to go get my manure spreader, I need it". Mr. Lafleur replied, "Oscar, she sold it to me, she didn't only lend it to me".
Mr. Sylvester then said, "Well, Lake you knew that was for me" and "How much did you pay?" And he said, "$200.00". Sylvester then said, "Oh, God, $200.00 for that manure spreader". He said, "Well, look Oscar, I don't want to get in troubleinvolved with you and your wife, you all get together and return my $200.00 and come and get that manure spreader". This offer to accept $200.00 and permit Mr. Sylvester to take the manure spreader was later withdrawn because, as Lafleur testified, he had broken the one he already had and he'd have to have one, and moreover, when he told Mrs. Sylvester about Mr. Sylvester claiming that it belonged to him, she told him that she would prefer that he not let Mr. Sylvester have the implement. Be that as it may, the fact remains that Mr. Sylvester did go to Mr. Lafleur's place and, without asking or obtaining anybody's permission or consent, went on the land, searched for and found the manure spreader that he claimed belonged to him. As he was leaving Mr. Lafleur saw him coming across the pasture from toward the Lafleur barn. He went to meet Mr. Sylvester and after some preliminary remarks, Mr. Sylvester said, "Well, I will have to sue Lola for my manure spreader and I will have to involve you in it". Mr. Lafleur testified that he said, "Oscar, the only thing that I can tell you is that I bought it, I'm sorry I bought it, but that is all I can do is tell the Court that I bought the manure spreader".
On that same day, Mr. Sylvester driving his tractor, with a colored boy with him, drove to the Lafleur place. He, himself, drove the tractor on to the place because, as he testified, he didn't want to involve the colored boy, "if there was any involving in it". The gate in the fence enclosing Mr. Lafleur's place was closed and locked with a chain and padlock, but Mr. Sylvester lifted the gate off its hinges, drove his tractor through the opening and onto Mr. Lafleur's premises, where he fastened the manure spreader onto his tractor and took it with him and placed it on his own, that is Mr. Sylvester's place, and where it has since remained. He said that while Mr. Lafleur had not demanded the return of the implement, he, Sylvester, would have refused had Lafleur so demanded.
As we have pointed out the manure spreader belonged to Mrs. Sylvester, hence, she had the perfect legal right to sell it to Mr. Lafleur, or to anybody else she chose, and Mr. Lafleur had the legal right to buy it from her, which he did.
*101 Defendant-Appellee, in his answer in the Trial Court in his answer to the Appeal in this Court, and in his brief in this Court, poses a proposition of law that we do not find has heretofore been decided in this State. It is this:
"Defendant Had the Privilege of Entering Plaintiff's Premises to Recover His Manure Spreader because Plaintiff Was Guilty of Wrongdoing in Placing the Manure Spreader on His Premises". (Emphasis added.)
We think Mr. Lafleur was in perfect good faith and was not chargeable with any wrongdoing in placing the manure spreader on his place, hence the proposition of law above quoted and posed by counsel, is without application to the facts of this case and, therefore, must be rejected. However, before passing on from the question under discussion, it is proper for us to say that we don't want it to be understood that the only reason we reject the defendant's argument last above quoted is because of the absence of any wrongdoing on the part of plaintiff in placing the chattel on his place. We are not ready, at this time either to approve or to reject, without reservation or exception, the proposition as stated by defendant. It will require the gravest consideration before it is adopted in Louisiana, if it ever is.
Certainly the Court cannot approve or condone what Mr. Sylvester did in the instant case. He knew Mr. Lafleur had not stolen the spreader that both claimed and he knew Mr. Lafleur had not come into its possession in any other clandestine or surreptitious manner. Mr. Sylvester had available, had he chosen to use it, an effective and prompt remedy at law for obtaining possession of the chattel if, in fact, it belonged to him, as he contended it did. He could have, before January 1, 1961, under Article 275 C.P. or if after that date, under Article 3571 LSA-C.C.P. obtained a writ of sequestration, and the Court would have taken possession of the property until its ownership could have been decided. That would have been the orderly and lawful way to have the controversy determined. But Mr. Sylvester did not choose to do it that way. He didn't even consult his own attorney for the purpose of determining what his legal rights were. Nor did he ask Mrs. Sylvester by what right she had sold the implement. On the contrary, he drove his tractor to Mr. Lafleur's place and in Mr. Lafleur's absence and without his consent or approval, he lifted Mr. Lafleur's locked gate from its hinges, opened the gate, drove his tractor onto the land, fastened the manure spreader to the tractor and took it to his own place, where he has since kept it and says he will refuse to give it up. It seems to us that it would be difficult to imagine a more flagrant and willful invasion and violation of another's private property rights, a willful trespass and conversion.
"Any unlawful physical invasion of another's property is a `trespass'". Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471, 472.
"Where one enters the premises of another without his consent, and without judicial process, takes property therefrom, under any claim or pretext whatever, it is a trespass vi et armis, and the injured party is entitled to substantial damages, however gently the trespasser may have acted". Bettis v. Singer Sewing Machine Co., 10 Or. App. 273. (Emphasis added.)
"Conversion is any distinct act of dominion wrongfully asserted over another's personal property". Edwards v. Max Thieme Chevrolet Co., La.App., 191 So. 569, 571.
Every conversion of property of another is a tort and in some aggravated cases the amount of damages exceeds the pecuniary loss. Edwards v. Max Thieme Chevrolet Co., La.App., 191 So. 569. (Emphasis added.)
That Mr. Sylvester is guilty of having trespassed upon Mr. Lafleur's property and converted his property, the manure *102 spreader, cannot be seriously questioned. Nor can it be doubted that in so doing, he, Mr. Sylvester, committed torts for which he is obligated, under the law, to repair any damages thereby caused Mr. Lafleur.
Perhaps the most difficult part of the case remains to be decided, that is the amount of damages, if any, to which plaintiff is entitled.
The first item of damages claimed by plaintiff, in his petition, is "value of property converted (if not ordered returned by the Court) $200.00".
It is true that, ordinarily, damages resulting from wrongful conversion is the value of the property converted, but in some aggravated cases the amount of the damages exceeds the pecuniary loss. Edwards v. Max Thieme Chevrolet Co., La.App., 191 So. 569. In this case, while plaintiff paid only $200.00 for the implement Mr. Sylvester, himself, testified it would sell now (at the time of the trial) for more than $800.00. So it seems that the value of the implement converted could reasonably be fixed at $800.00 and judgment in that amount against defendant would have been justified for the property, but we have found that the property belongs to plaintiff and in this Court, he still expresses the preference that it be ordered returned to him. Since the chattel is still, or was at the date of the trial, in Mr. Sylvester's possession, and is the property of Mr. Lafleur, we see no reason why it should not be ordered returned to Mr. Lafleur, and, in that case, plaintiff's demand will have been granted and will not be entitled to the value of the property, also.
As the District Judge pointed out in his reasons for judgment, there is no proof in the record of any actual pecuniary loss suffered by plaintiff. Having held that the manure spreader was the property of defendant, that Court, of course, denied plaintiff damages for such claims as the loss of use of the implement, attorney's fees, etc., but having held defendant guilty of trespass on plaintiff's land, he awarded plaintiff judgment against defendant, for the trespass for what he called "nominal damages" in the sum of $250.00 with legal interest from January 12, 1961, until paid, and all costs of both courts.
We will next dispose of the item of $2000.00 claimed by plaintiff as attorney's fees, as a part of the damages he claimed he suffered as a result of defendant's wrongful acts.
The rule is that, in the absence of contract or statute, attorney's fees are not recoverable as damages. This question was gone into in some detail by Judge Tate, a Judge of the Court of Appeal of the former First Circuit, now the presiding Judge of this Court, in Loeblich v. Garnier, La.App., 113 So.2d 95, and on rehearing held that attorney's fees are not recoverable in such cases.
"Attorneys' fees are not recoverable in a civil action in absence of statute or contract". Rhodes v. Collier, 215 La. 754, 41 So.2d 669.
and continuing
"In cases where attorneys' fees are allowed, absence of proof that fees have actually been paid or that an obligation for payment of fees has been incurred, defeats recovery of fees".
The record is silent as to proof that plaintiff has paid or obligated himself to pay any attorney's fees in this case. He did testify that he had found it necessary to employ an attorney, but went no further on the point. Plaintiff's demand for attorney's fees must be denied.
As the next item of damages claimed by plaintiff, we will consider his claim for "loss of use of the implement". Here, again, there is no proof of this item. It is true that one witness testified that he had rented the implement from Mr. Sylvester for one week at $10.00 per day, but there is no proof that Mr. Lafleur would have or could have rented the equipment, had he had it in his possession or if so, for how long a period. While Mr. Lafleur said he had needed the spreader since Mr. *103 Sylvester took it, it is not shown that he rented another or that its absence caused any particular loss. Plaintiff's claim for the loss of the use of the implement must be denied.
We prefer to consider, together, plaintiff's demands for (2) Damages for wrongful conversion (3) Humiliation, mental anguish and embarrassment and (4) Trespass on property. No direct pecuniary loss or damage was proved in support of either of these claims. Plaintiff's counsel argues that this is a case where "punitive damages" should be awarded. We can't agree that punitive damages, as such, are recoverable in any event, in this State. The only right of action to be found in our Code authorizing the recovery of damages, ex delicto, is to be found in the first sentence of Article 2315 of the LSA-Revised Civil Code of Louisiana, which reads as follows:
"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it".
The only obligation therein imposed upon the wrongdoer is to repair the damage that his wrongful action causes. In other words, except, perhaps, in the jurisprudence, there is no authority in Louisiana, for the injured party to collect any thing except that which will repair the damages he has suffered as the result of a wrongful act of another.
That plaintiff's private property rights were ruthlessly, willfully and in total disregard of his feelings, violated cannot be seriously questioned. Courts have repeatedly taken notice of the mental shock suffered by a slandered or libelled person. We believe that we are justified in taking notice, as a matter of common knowledge, that one who has suffered such an invasion of his private property and such a violation of his right to be secure in the exclusive enjoyment of his own property, naturally suffers a severe mental shock and a severe laceration of his feelings, or intense mental anguish. Mr. Sylvester's trespass and conversion, in this instance, amounted to an unwarranted illegal entry, search and seizure, for which he is liable to plaintiff, even in the absence of proved pecuniary loss, of compensatory damages in a substantial amount, as distinguished from "nominal" damages. Drawing further on our common knowledge and the experiences of life we know that such invasions of private property often produce such mental upheavals or upsets as to lead to the most tragic results, many men believing that they have the right to protect their private property from invasion, even to the extent of taking of human life, if necessary, to protect that right.
One notable example of an award in a case of willful illegal and physical trespass upon plaintiff's land is found in Bright v. Bell, 113 La. 1078, 37 So. 976. There an unsightly hedge along and within plaintiff's boundary was destroyed by some road commissioners, despite plaintiff's remonstrance. The Supreme Court (increasing a lower Court judgment of $100.00) awarded $1,000.00 "for the invasion of his rights and the injury to his feelings", 113 La. 1090, 37 So. 980, even though no intrinsic value of the hedge was shown by the record and though the removal of the hedge resulted in a benefit to plaintiff's property as well as the surrounding neighborhood.
Some other willful and forcible trespass cases making similar types of awards are these: Nickerson v. Allen Bros. & Wadley, Ltd., 110 La. 194, 34 So. 410 (excess of $840.00 judgment over $686.25 actual pecuniary loss awarded. Nicol v. Illinois Central Rwy. Co., 44 La.Ann. 816, 11 So. 34; Williams v. Harmanson, 41 La.Ann. 702, 60 So. 604 ($500.00 awarded for damages for unlawful eviction, including attorney's fees of unspecified amount), Cooper v. Cappel, 29 La.Ann. 213 ($1,000.00 damages awarded including $350.00 for removal of cotton bales, and the remainder for injury to the feelings of plaintiffs and attorney's fees). Similar types of awards are to be found in Humphreys v. Bennett Oil Corp., 195 La. 531, 197 So. 222 ($6000.00 awarded for mental anguish suffered from desecration of graves in country cemetery); *104 Dodd v. Glen Rose Gasoline Co., 194 La. 1, 193 So. 349, 353 ($1,500.00 awarded for the impairment of the "enjoyment of petitioners of their home" for improper disposal of waste gases from adjoining gasoline plant); Walker v. J. J. Ellis Lake Providence Furniture Corp., La.App., 2 Cir., 107 So.2d 550, (Awarding $100 for inconvenience and embarrassment resulting from the wrongful seizure through legal process of plaintiff's property.)
In Loe v. Whitman, La.App. 1 Cir., 107 So.2d 536, two Highway patrolmen, armed with a warrant that subsequently appeared to have been improperly issued, went to plaintiff's place and removed some of plaintiff's mules which they thought plaintiff had been permitting, illegally, to roam at large on the highway. The mules were retained for 18 months, but no pecuniary loss was established. The officers were held liable for trespassing on plaintiff's property and he was awarded $250.00 damages in addition to the attorney's fees that were proved to have been paid. The Supreme Court denied writs.
Under the jurisprudence above cited, applied to the facts of the present case, we feel that as compensatory damages, plaintiff is entitled to recover, in addition to a judgment awarding the manure spreader to him and ordering its return to him, a total sum of Seven Hundred Fifty and No/100 ($750.00) Dollars, with five (5%) per cent per annum interest thereon from judicial demand until paid. The District Judge allowed interest on the money judgment from January 12, 1961. The trespass, for which the award was granted occurred January 11, 1961, and the conversion on the same date. In conversion cases, interest has usually been awarded from the date of the conversion. But in this case the damages awarded, are ex delicto, hence, the interest must attach from judicial demand under LSA-R.S. 13:4203, reading as follows:
"Legal interest shall attach from date of judicial demand, on all judgments, sounding in damages, `ex delicto', which may be rendered by any of the courts".
The judgment for the amount above stated is for all such damages as he has sustained by reason of the wrongful conversion of said manure spreader by defendant as well as all damages he sustained by the trespass defendant committed on his land, as well as for the humiliation, embarrassment and mental anguish he has suffered.
Accordingly, the judgment of the District Court is affirmed in part, reversed in part, amended in part and rendered so as to read as follows:
It Is Ordered, Adjudged and Decreed that plaintiff, Lake Lafleur, do have and recover judgment against defendant, Oscar Sylvester, Jr., decreeing plaintiff to be the owner of the McCormick manure spreader, for which he herein sues, and ordering defendant to deliver possession of said manure spreader to the plaintiff immediately upon this judgment becoming final.
It is further ordered, adjudged and decreed that plaintiff, Lake Lafleur, do have and recover judgment against defendant, Oscar Sylvester, Jr., in the just and full sum of Seven Hundred Fifty and No/100 ($750.00) Dollars, together with five per cent (5%) per annum interest thereon from judicial demand until paid.
It is further ordered, adjudged and decreed that the demands of defendant, as plaintiff in reconvention, be and they are hereby denied.
It is further ordered, adjudged and decreed that defendant pay all costs in both courts.
Affirmed in part, reversed in part, amended in part and rendered.

On Application for Rehearing.
En Banc. Rehearing denied.
FRUGE, J., recused.