361 So.2d 925 (1978)
Elliott P. BOISDORE
v.
INTERNATIONAL CITY BANK & TRUST COMPANY.
No. 9247.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1978.
Rehearing Denied September 12, 1978.
Writ Refused October 26, 1978.
*927 Levy, Smith & Gennusa, Adolph J. Levy, New Orleans, for plaintiff-appellant Elliott P. Boisdore.
Lemle, Kelleher, Kohlmeyer & Matthews, Earl S. Eichin, Jr., New Orleans, for defendant-appellee Federal Deposit Ins. Corp., Receiver for International City Bank & Trust Co.
Myers N. Fisher, Asst. Gen. Counsel, Michael B. Burgee, Federal Deposit Ins. Corp., Washington, D. C., of counsel.
Before SCHOTT, BEER and GARSAUD, JJ.
GARSAUD, Judge.
This appeal is from the trial judge's dismissal of plaintiff's suit for wrongful eviction from leased premises and for illegal seizure and tortious conversion of certain movable property located on the premises. As plaintiff's pleadings were vulnerable to exceptions of vagueness, three amendments were required to state a clear and valid cause of action. In the original petition and first two amendments, only the wrongful seizure of plaintiff's property was asserted as a claim. It was not until the third supplemental and amending petition that the existence of a lessor-lessee relationship was claimed, that the date of the alleged wrongful seizure was first mentioned, and the allegation made that changing the locks on the premises was done without any judicial process or notice of eviction. Further, it should be noted that in all the petitions the only claims for damages are (1) for loss of income from the date of the changing of the locks, and (2) for mental anguish and embarrassment resulting therefrom. No claim is made for the return of the items wrongfully seized (or for their value), or for the alleged wrongful eviction.
Briefly stated, the facts are that plaintiff Boisdore owned several pieces of property in New Orleans, including the premises located at 2123, 2123½, 2129 and 2131 Columbus Street, all of which were mortgaged to the defendant International City Bank and Trust Company (ICB). Foreclosure proceedings began on most of these properties in 1972. Those specifically related to the premises at 2123-2131 Columbus Street, which are all that are the subject of this suit, resulted in the sale of these premises at public auction to ICB in November of 1972.
Plaintiff Boisdore used these premises for the operation of a nursery school (including kindergarten and first grade). Consequently, since the foreclosure and sale took place in the middle of the school year, he had a particular interest in being allowed to stay on the premises. Apparently some of the students' parents were concerned with the foreclosure and "For Sale" notice posted on the premises by the Civil Sheriff and had removed some of the children from the school. The evidence reflected that in response to Mr. Boisdore's concern on this point, Mr. Remus Hebert, Senior Vice President of ICB, wrote him a letter of assurance that if the bank was the successful purchaser at the foreclosure, it would lease the premises back to him. Thus, although a letter of eviction from Mr. Ronald Newman, attorney for ICB, was sent to Mr. Boisdore in December 1972, there was apparently no intention on the part of ICB to evict him. Several lease agreements were prepared, but Mr. Boisdore never signed any of them, as he did not want to be committed to a long-term lease, which ICB felt was necessary to justify carrying such a large piece of property on their books. Although no lease was ever signed, in January of 1973 Mr. Boisdore began paying $1,600 per month to ICB, which continued through May 1973. No such payments were made during November and December of 1972. Mr. Boisdore called these payments "rent," and claims an oral lease at that stipulated rental; however, although ICB referred to this as "rent" in various communications and memos, it apparently applied these payments to reduce the principal owed by Mr. Boisdore on the deficiency judgment. Mr. Hebert testified that the bank never intended for Mr. Boisdore to occupy the premises without a lease.
When summer 1973 arrived, Mr. Boisdore realized that it would not be economically *928 feasible to keep the school open for the summer session and, as a result, he would not be able to pay $1,600 per month during the summer months. Consequently, in June of 1973 he wrote Mr. Newman, attorney for ICB, the following letter:
 "Mr. Ronald Newman
 Attorney-at-Law
 International Trade Mart Bldg.
 New Orleans, Louisiana
"Dear Mr. Newman:
 "Because of a very light registration
for our summer day camp session, it is
necessary that we cancel it for the
months of June, July and August.
 "Unless rent payments can be suspended
for these months, we would be compelled
to cease operations completely, and
vacate the premises.
 "Kindly let me hear from you regarding
this matter.
 "Very truly yours,
 Elliot P. Boisdore"
Mr. Newman, by letter of June 11, 1973, responded that he would set up a meeting between Mr. Boisdore and Mr. Hebert to discuss the matter. This meeting never transpired. According to Mr. Hebert's testimony, there was never any possibility of such an arrangement, and this was known by Mr. Boisdore. In any event, no payments were made by Mr. Boisdore to ICB in June or July 1973. About the same time, on July 19, 1973, Mrs. Boisdore, through attorney Joseph Casey, wrote to Mr. Hebert proposing a $1,000 monthly rental for a term of nine months, renewable annually. Apparently, nothing came of any of this. Thus, for June and July Mr. Boisdore retained possession but made no payments.
In early August, ICB learned that there was a possibility they could sell the Columbus Street property, and thus the bank authorized James Stroughter, a real estate agent, to show the property to the prospective buyer. When it was realized that Boisdore had the only keys to the buildings, Mr. Lewis, ICB Vice President, authorized Stroughter to have the locks changed to gain access to the buildings and to show the property. The prospective sale did not materialize, and subsequently no use was made of the premises by Boisdore or ICB. It should be noted that the changing of the locks was not done for the purpose of evicting Mr. Boisdore or to protect the security behind the chattel mortgage, but to permit ICB access. It is clear, on the other hand, that no notice or warning of the lock change was given to Mr. Boisdore at any time.
A great deal of equipment located on the premises for the operation of the school was now unavailable to Mr. Boisdore. Some of this equipment was the security for a chattel mortgage held by ICB; however, some of it was owned outright by him. This was readily admitted by ICB officers, but nonetheless they refused to let him remove these items. All parties agree that ICB never claimed ownership of all the items and kept promising to let Mr. Boisdore remove his property. However, although Mr. Boisdore was allowed in to make an inventory with bank representatives some nine months after the locks were changed, he still was not allowed to remove anything from the premises. It was not until August 1974, one full year after the "conversion," that he obtained his property. The obvious difficulty was that there was great similarity between those objects that belonged to Mr. Boisdore and those subject to the chattel mortgage, and ICB clearly did not want Mr. Boisdore to remove the items which belonged to it under the chattel mortgage.
The basic issues are as follows:
(1) What was the nature of the legal relationship, if any, between Mr. Boisdore and ICB stemming from the former's possession and use of the property after the foreclosure proceedings?
(2) Presuming there is some legally cognizable relationship between the parties, what duty, if any, was owed to Mr. Boisdore regarding the return of his property?
(3) Presuming a breach of some duty, what compensable damages, if any, were suffered by Mr. Boisdore and how are those damages to be assessed?
*929 The initial question to be determined is the legal relationship arising as a result of Mr. Boisdore's possession of the property subsequent to the foreclosure. The record indicates that after the foreclosure sale, Mr. Boisdore continued in the possession and use of the property, operating his school in the months of November and December 1972 without payments of any nature being made to ICB. Further, in December 1972 Mr. Boisdore received from Mr. Newman, attorney for ICB, a letter which stated,
"Please accept this as your notice to vacate the captioned properties on or before January 2, 1973. Should you fail to do so, we will request the clerk to issue a writ of possession to the sheriff for eviction pursuant to R.S. 13:4346."
Thereafter, apparently as a result of negotiations among attorneys, Mr. Boisdore, as previously noted, made payments of $1,600 a month to ICB from January through May 1973. These payments were part of checks drawn for $2,000 ($1,600 for the school, $400 for his residence) which were designated as "rent" by Mr. Boisdore, and which were clearly referred to as "rent" in correspondence among attorneys for the parties, as well as among certain bank officers (including internal correspondence of the bank). Additionally, the record reveals that after the letter of June 1973, quoted above, was sent by Mr. Boisdore to Mr. Newman, Mr. Boisdore ceased to make payments in June and July 1973. Finally, as also noted above, his wife offered the bank a proposal to rent the premises for a nine-month term at $1,000 a month.
We do not believe the record supports the establishment of a lessor-lessee relationship. As this Court has stated,
"Mere occupancy of a building does not of itself imply the relationship of lessor and lessee. A lease is a contract by which one party gives to the other the enjoyment of a thing at a fixed price. As in the contract of sale, there are three absolutely essential elements to a lease: the thing forming the subject matter of the contract; the price for the enjoyment of the thing; and the consent or agreement of the parties. There can be no contract of lease in the absence of a stipulation or agreement between the parties as to the amount of rent to be paid." Groghan v. Billingsley, 313 So.2d 255, 258 (La.App. 4th Cir. 1973), writ refused, La., 318 So.2d 46, 48.
There simply never was any consent to a lease on the part of these parties, nor was there ever any agreement on the precise amount of the rent. Mr. Boisdore consistently refused to sign any formal agreement proffered by ICB. These factors all indicate that at best these parties were simply negotiating, going back and forth, offering and counteroffering proposals for an arrangement or a relationship which would culminate in a lease. During this formative period of the proposed lease, these factors did not mature into a lessor-lessee relationship under the appropriate requirements of the Codal articles. Many of these actions are simply inconsistent with any conclusion that there was a lease, written or oral, for the premises in the amount of $1,600. The fact that the payment was described as rent by the parties is not, in and of itself, sufficient to overcome the clear implications of the actions in which the individuals involved participated. Accordingly, the trial court was correct in its conclusion that there was no lease and that there was no lessor-lessee relationship between the parties.
The next consideration then is, what was the relationship between Mr. Boisdore and ICB in August of 1973, when the locks were changed and he was effectively denied entrance to and use of the premises? The appellant argues that he was an "occupant," as defined in Code of Civil Procedure Article 4704. That article states in part, "Occupant includes . . . any person occupying immovable property by permission or accommodation of the owner . . ." The language, "by permission or accommodation of the owner," has been interpreted by this Court to mean "there has existed between the parties a contractual relationship of some kind, expressed or implied, *930 relative to the occupancy of the property." Stroughter v. Shepherd, 207 So.2d 865, 867 (La.App. 4th Cir. 1968). It is our opinion that, although there was no lease agreement during the time all these proposals and counterproposals took place, many of which were inconsistent with a lessor-lessee relationship, there is nothing in the record to indicate that Mr. Boisdore did not have at least the implied permission of ICB to remain in those premises. He thus was an "occupant." As a matter of fact, even when the locks were changed, the testimony of all the defendant's witnesses was to the effect that the locks were changed not to evict Mr. Boisdore, but simply to permit the bank access in order to show the property to prospective buyers, as Mr. Boisdore had the only set of keys to the old locks. Appellee makes much of the eviction letter of December 1972 to indicate that there was no permission to occupy these premises, but the remaining actions on the part of ICB belie this fact. Further, it is apparent that the letter sent by Mr. Newman does not really indicate a change in the bank's willingness to permit Mr. Boisdore to remain and to run his school, but rather was sent as a result of some misunderstanding subsequently rectified by negotiations among the attorneys which resulted in the beginning of the $1,600 payments in January 1973.
As an occupant, therefore, Boisdore was "constructively evicted" from the premises when the locks were changed. He was entitled then to a prior notice to vacate under Article 4702 of the Code of Civil Procedure, which notice was not given by ICB. However, plaintiff has neither claimed, asserted, nor proved any damages relative to this constructive eviction, nor does the record support any damages for this eviction per se.
However, plaintiff does assert that he has been damaged by this action on the part of ICB in that his property was "illegally seized" or "converted" by the defendant. As noted before, this claim brings us to the issue of whether, once the locks were changed, ICB owed any duty to Mr. Boisdore as far as his personal property locked in the premises was concerned.
We believe ICB, giving due consideration to the protection of its own interest (i. e., preserving the chattel mortgage), owed a duty to Mr. Boisdore to permit him to retrieve his property within a reasonable period of time. When it became evident, as a result of the change of the locks, that Mr. Boisdore would no longer have admittance to those premises to run his school, and when he requested the return of his property, then there was a duty on ICB to organize its affairs, considering its own protection under the chattel mortgage, in such a fashion as to provide Mr. Boisdore access to the premises within a reasonable time in order to remove his property. Certainly some delay would have been reasonable; but we believe that by delaying for an entire year, ICB breached that duty, resulting in a wrongful detention or conversion of plaintiff's property under Article 2315 of the Civil Code. "Conversion includes any act of dominion wrongfully asserted over the property of another in denial of or inconsistent with the owner's rights therein." Hamilton v. Travelers Indemnity Co., 248 So.2d 617, 619 (La.App. 3rd Cir. 1971). See also, Importsales, Inc. v. Lindeman, 231 La. 633, 92 So.2d 574 (1957); Marcel v. Denton, 195 So.2d 163 (La.App. 1st Cir. 1967).
Clearly, a conversion of plaintiff's property took place, because ICB was well aware that it had some of plaintiff's property in its control and that plaintiff was thereby deprived of their use. That it was difficult to distinguish those items under the chattel mortgage from those belonging to plaintiff is no excuse for a delay of an entire year in allowing plaintiff access to his property.
ICB contends that no conversion took place because it never denied that these things belonged to Mr. Boisdore and it never refused to return them. This argument appears very specious because in spite of the repeated promises, Mr. Boisdore was not allowed to remove his things. It would be wrong to fail to find conversion merely because ICB was agreeable and never denied Mr. Boisdore's ownership. Their actions, *931 or more precisely, failure to act timely, rather than their motives, control.
For this conversion, plaintiff seeks damages of $150,000 for "loss of income from the date of the illegal changing of the locks to the present and in the future," and $100,000 for "mental anguish and embarrassment and other damages which were suffered as a result of the illegal seizure." He does not specifically request the traditional damages for conversion, which consist of the return of the property itself, or if the property cannot be returned, the value of the property at the time of the conversion. Marcel v. Denton, supra; Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1959); Lafleur v. Sylvester, 135 So.2d 91 (La.App. 3rd Cir. 1961).
With regard to the latter first, it is well-settled that under our fact-pleading,
"[s]o long as the facts constituting the claim [here, damages for conversion] are alleged or proved, the party may be granted any relief to which he is entitled under the fact-pleadings and evidence; the `theory of the case' is abolished as a pleading requirement or restriction."
Cox v. W. M. Heroman & Co., Inc., 298 So.2d 848, 855 (La.1974)
As Boisdore did receive a portion of his property back, the question is whether he proved the value of the property which was converted but not returned and to which he is entitled under Cox, even though such relief is not specifically prayed. We believe Exhibit Boisdore-33, plus testimony regarding its introduction (Record, Vol. V, Part 2, page 31) sufficiently support his claim, and prove his loss in this regard. There was no contradictory evidence denying his outright ownership his subsequent loss of these items, or the valuation of them. Accordingly, he is entitled to recover $7,058.70 for these items. (This amount excludes from the list in Boisdore-33 the value of the piano, which he conceded in testimony was subject to the chattel mortgage.)
Mr. Boisdore's specific claims for damages are not as easily resolved. His first claim is for loss of earnings as the result of the conversion. He argues that had he been permitted to remove his property in August of 1973, he could have opened his school timely at an alternate site for the 1973-74 school term and, of course, continued thereafter. Failing to do this, he has been deprived of the income he would have earned had the school been in operation.
Regarding the 1973-74 school year, it is our view that, as a result of the reasonable time accorded ICB to unscramble the co-mingled property (those items subject to the chattel mortgage and those not subject), as noted above, there simply was no way for Mr. Boisdore to obtain his property from ICB for use in a new school for August or September of 1973. At that point, an unreasonable delay had not occurred and no damages had yet resulted from the conversion.
With regard to future years, there is no evidence to show that such losses, if any, were caused by defendant's tort. By the time of the 1974-75 school year, plaintiff was in no way deprived of his ability to operate the school because of defendant's actions. Plaintiff had sufficient time to organize his affairs to begin the 1974-75 year without the use of the property which was the subject of the conversion. Additionally (and this analysis would apply alternatively to the 1973-74 year), there was a great deal of evidence introduced concerning the "alternate site," its suitability and adaptability for a school. Mr. Boisdore's accountant, Mr. Reynard Rochon, and an economist, Dr. Melville Wolfson, testified at length regarding income projections for the school and the amount of income Mr. Boisdore lost as a result of closing the school. However, it is not clear at all that the so-called alternative site could or would have been effectively used for the school, or that the equipment actually would have sufficed to allow him to open a school next door. Additionally, the experts' projections were all based on mere assumptions not verified by them, that enrollment would increase, tuition would increase, and a number of other variables. In view of the highly *932 speculative and conjectural nature of these alleged damages, they should be denied. Campbell v. Lelong Trust, 327 So.2d 533 (La.App. 3rd Cir. 1976), writs refused, La., 331 So.2d 494.
This leaves the claim for mental anguish, humiliation and embarrassment. That these are proper items for recovery for tortious conversion was most recently restated in Alexander v. Qwik Change Car Center, Inc., 352 So.2d 188 (La.1977), citing Grandeson v. International Harvester Credit Corp., 223 La. 504, 66 So.2d 317 (1953); Hamilton v. Travelers Indemnity Company, 248 So.2d 617 (La.App. 3rd Cir. 1971); Gullatt v. Ashland Oil & Ref. Co., 243 So.2d 820 (La.App. 2nd Cir. 1971); 48 Tul.L.Rev. 1171-1172; 51 Tul.L.Rev. 753. The appellee's reliance on Meador v. Toyota of Jefferson, Inc., La., 332 So.2d 433 (1976) is wholly misplaced. That case, as specifically pointed out by Justice Calogero, is applicable to cases involving breach of contract and not, as here, to actions under Article 2315 of the Civil Code.
It is difficult to assess damages of this sort accurately because, as in awards for pain and suffering, the damages cannot be calculated with exactitude. However, the mere fact that plaintiff was wrongfully deprived of his property for a period of time necessarily means that some mental anguish and humiliation and embarrassment resulted. Bostwick v. Avis Rent-a-Car, 215 So.2d 854 (La.App. 1st Cir. 1968); Steadman v. Action Finance Corporation, 197 So.2d 424 (La.App. 2nd Cir. 1967), writ refused 250 La. 907, 199 So.2d 918. It is much more difficult to arrive at the amount than to conclude that plaintiff is entitled to these damages.
The evidence establishes that Mr. Boisdore suffered a great deal of mental anguish as a result of this loss of his property. Even if it were not properly established that he could have opened up a school next door if he had had his equipment, he certainly believed that he could have done so, which only increased his frustration and anguish as the delay grew longer and longer. In addition, aside from his school equipment, many school records were locked in the buildings, such as children's health certificates and teachers' teaching certificates. As a result, parents and teachers were constantly calling him because they needed these records either to enroll their children elsewhere or to teach elsewhere. These constant telephone calls, when he had no answers to give, were particularly emotionally disturbing to him.
Both plaintiff and his wife testified regarding the change in Mr. Boisdore's personality after the school closed. Apparently the school was especially important to him because he had started it in memory of his mother, naming it after her because she had operated a nursery school for thirty or forty years. He and his wife worked very closely with the school and had an excellent relationship with each other, which deteriorated seriously after the school was closed. The Boisdores separated in August 1974 and had not reconciled at the time of trial in 1976.[1] Friends of the Boisdores, Mr. and Mrs. Robert Francis and Mr. Joseph Laura, also testified to the devastating effects of the school's closing on Mr. Boisdore.
Although awards for this element have been allowed, the awards granted have been particularly small. In 1968, in Bostwick v. Avis Rent-a-Car, supra, the plaintiff was awarded $250 for the wrongful conversion of his clothes over an 18-month period (his clothes were found by the court not to have any real value). The same amount was awarded in Steadman v. Action Finance Corporation, supra, for the wrongful seizure of plaintiff's automobile. The court awarded $1,000 for mental anguish and inconvenience in the recent case of Alexander v. Qwik Change Car Center, supra.
In Lee v. Lewis, 339 So.2d 513 (La.App. 2nd Cir. 1976), the Second Circuit reduced a $750 award for humiliation, embarrassment *933 and inconvenience to $200. The court felt that the embarrassment for the conversion of plaintiff's truck for his default in payments was minimal. However, in Hamm v. Sales Financing, Inc., 181 So.2d 480 (La. App. 2nd Cir. 1965), an award of $1,500 was found to be neither inadequate nor excessive. There the defendant had wrongfully seized plaintiff's furniture from her house while enforcing a chattel mortgage on plaintiff's daughter's furniture. Similarly, in Vercher v. Toda Enterprises, Inc., 216 So.2d 318 (La.App. 3rd Cir. 1968), an award for $1,000 was sustained, where the defendant's manager used profanity and excessive force when wrongfully repossessing plaintiff's automobile in front of witnesses. Plaintiff, Vercher, was denied possession of his property for approximately 18 months.
In another recent case, Deshotels v. Statewise Trailer Sales, 333 So.2d 259 (La. App. 1st Cir. 1976), a $1,000 award of general damages was sustained. Defendants converted plaintiff's trailer and refused to return it after demand. There appeared to be no other particularly aggravating facts.
In 1958, the Supreme Court reduced a $1,500 award for humiliation, mortification, mental anguish, and inconvenience to $1,000 in Hernandez v. Harson, 237 La. 389, 111 So.2d 320 (1959). The court recognized specifically this element of damages as not being confined by any necessity of showing actual pecuniary loss or any particular malice or harshness on the part of defendant. This case seems particularly appropriate for consideration here, since no malice or undue harshness is alleged.
Considering all the facts in this case, we believe a substantial award for mental anguish and humiliation is justified. Mr. Boisdore may have been overly optimistic about the feasibility of opening a school on the "alternate site." Likewise, he may have overreacted to the circumstances in which he found himself. However, we think it clear that he has suffered noticeably and the entire affair has had an adverse effect on his life. An award of at least $7,500 in general damages for mental anguish is justifiable; to be reduced, however, by the value of the use of the premises which Mr. Boisdore enjoyed in November and December 1972, and June and July 1973. Marcel v. Denton, supra. As we have found that no precise figure for rent was agreed upon, we believe that a fair resolution would be to split the difference between what was offered as a short-term lease by the Boisdores ($1,000 a month) and the amount suggested by ICB for a long-term lease ($1,600 a month). Thus, a reduction of $1,300 for four months, or $5,200 total, is appropriate.
Accordingly, as the trial court dismissed plaintiff's claim once it had determined that no lessor-lessee relationship existed, we must reverse that dismissal.
THEREFORE, IT IS ADJUDGED AND DECREED that defendant, International City Bank and Trust Company, is liable unto plaintiff, Elliott P. Boisdore, in the amount of $7,058.70 for the value of the property lost by the conversion; further, that the defendant is liable unto plaintiff for damages for mental anguish and humiliation in the sum of $7,500, less $5,200 for plaintiff's use of premises, all with interest from date of judicial demand, costs to be borne by defendant-appellee.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
SCHOTT, J., is of the opinion the rehearing should be granted and assigns reasons.
SCHOTT, Judge, dissenting from denial of rehearing.
I vote to grant a rehearing because I would like to reconsider our original opinion insofar as we granted ICB an offset of $5200 against plaintiff's claim.
NOTES
[1] The Boisdores had been separated briefly before, in 1971, as a result of Mr. Boisdore's financial difficulties.