SHORTESS, Judge.
Luther Lee Carson (plaintiff) filed suit against Central Progressive Bank (defendant) on November 16, 1979, seeking damages for wrongful eviction. Plaintiff was evicted from a certain tract of land used for hunting purposes, which consists of approximately 560 acres in Tangipahoa Parish, Louisiana. Defendant filed a reconventional demand claiming that it held a lease on the subject property, as security for a loan to Gordon W. Dillon, and that plaintiff had attempted to undermine its security and was thus liable to the bank for damages and attorney fees. The trial court ruled in plaintiff’s favor, awarding him $1,400.00, and denied the reconventional demand. From this judgment, dated March 8, 1982, defendant perfected this appeal.
Defendant contends that the trial judge was manifestly erroneous in (1) refusing to dismiss plaintiff’s suit under the bank’s plea of judicial estoppel; (2) concluding that the bank would be unjustly enriched if it was not required to reimburse plaintiff for the $1,400.00 rental which he had paid on the lease; and (3) denying its reconventional demand. Plaintiff answered the appeal and maintains that the trial judge was correct in holding that the bank had to reimburse plaintiff for the $1,400.00 rental charge, but erred in not finding the bank liable to plaintiff for the damages he sustained as a result of the alleged wrongful eviction.
This appeal presents the following three issues:
1.' Was the trial judge manifestly erroneous in referring defendant’s plea of judicial estoppel to the merits?
2. Did the bank fail to use the requisite legal process before evicting plaintiff from the subject property?
3. Was the trial judge erroneous in failing to award plaintiff damages for the losses he incurred as a result of the alleged wrongful eviction, in addition to the $1,400.00 rental reimbursement?
ISSUE NO. 1
We find no manifest error in the trial court’s decision to refer defendant’s plea of judicial estoppel to the merits and in not dismissing plaintiff’s suit. Defendant’s plea is more properly characterized as a claim that plaintiff judicially confessed defendant’s superior leasehold interest in the land, in a prior judicial proceeding, and is thus estopped from claiming any interest in the property in this suit. Plaintiff obtained a judgment against Gordon W. Dillon, dat *893 ed November 10,1978, and had Dillon evicted from the property. In that suit, Dillon filed a reconventional demand and asserted that he had never assigned his lease to anyone. In defense, plaintiff’s counsel asserted that Dillon had assigned the property to the bank and in memorandum stated that the bank was the only party with legal rights to seek redress for any unauthorized leasing to individuals with hunting dogs. These statements are classified as “extrajudicial” admissions, as they were made in a prior proceeding. They are admissible, but do not create conclusive presumptions or operate as an estoppel against the party making them, unless there is a showing of deception or prejudice. La.C.C. Art. 2291 and Twillie v. H.B. Zachry Co., 380 So.2d 747 (La.App. 4th Cir.1980), and authorities cited therein. The bank has neither claimed nor shown any prejudice or deception resulting from any reliance on these statements. Even assuming that plaintiff did admit such, this is a wrongful eviction suit wherein the issue is whether the bank followed the proper legal procedure before preventing plaintiffs entrance onto the property.
ISSUE NO. 2
The second issue involves a determination of whether the bank was within its legal rights in locking the gate to the property, thereby preventing plaintiffs entrance. In this context, we must examine the circumstances under which defendant and plaintiff claimed an interest in the property.
The property was owned by the Estate of Dr. J.H. McClendon, Sr., which, through its representative, Dr. J.H. McClendon, Jr., granted a lease on the 560 acres to Larry L. Lloyd and Gordon W. Dillon, dated September 21, 1976. Lloyd assigned all of his rights in the property to Dillon on April 5, 1977. On that same date, Dillon assigned his entire leasehold rights to the defendant bank, as security for a loan in the sum of $10,030.00, along with a chattel mortgage on certain equipment located on the land. This lease was recorded in the conveyance records of Tangipahoa Parish, and it is the instrument which defendant relies on to justify its actions on November 17, 1978, in locking the gate.
Plaintiffs history as to his possession of the land is somewhat involved. He stated that he met with Dillon on May 3,1978, and told Dillon that he would be willing to take the lease and to pay the annual rental of $1,400.00 to McClendon, Jr. He understood that he was assuming the remaining eight years on Dillon’s ten-year lease from McClendon and that Dillon had not yet paid the 1978 rental on the lease. Plaintiff paid the $1,400.00 by check dated May 5,1978, to McClendon, who accepted same.[1] Plaintiff further testified that on May 8, 1978, he entered the property with his trailers and started cleaning up and working on the land; that he began operating a sole proprietorship known under the trade name of “Tangi Shooting Preserve;” that from May 8 to November 17, he prepared the land as a quail farm in order to shoot pen-raised birds; that he pulled tree-tops, made water holes, repaired the road on the property, planted 35 feed patches for the birds; and that he generally put the place in shape. During this period, plaintiff knew and had conversations with Michael Pettit, defendant’s attorney at the time. He stated that he spoke to Pettit about his plans for the property; that Pettit was aware of his oral assignment, yet never disclosed to him the bank’s written assignment; and that Pettit had asked his permission for the bank to leave certain equipment on the property.[2] In September of 1978, Dillon attempted to take possession of the property from plain *894 tiff by locking the gate to the land. At this point, plaintiff filed an eviction suit against Dillon. Judgment was rendered in plaintiff’s favor on November 10, 1978, and he returned to the property.[3]
On November 17, 1978, plaintiff attempted to enter the property and found a huge chain about three feet long, with a lock on it, attached to the gate.[4] Plaintiff stated that he had never been served with a notice to vacate, nor were any signs posted on the gate or the door; that he was not able to use the land after November 17;[5] that he was told by his lawyer that the bank did not want him to go back onto the property; and that he had no other useful passageways onto his place of business, once the gate was locked.[6]
McClendon testified that plaintiff had come into his office many times; that he was under the impression that Dillon and plaintiff were in the bird and field trial business; that he agreed to the arrangement between plaintiff and Dillon, as long as he was paid the rent; and that the first time he saw the bank’s assignment was six months before trial. McClendon admitted accepting a check for $1,400.00 from plaintiff for the 1978 rent on the property, and further stated that he refused a check sent by the bank in 1979.[7]
Pettit testified that he was aware in 1978 that plaintiff and Dillon had an arrangement whereby they were both preparing the leased land for the coming season. Initially, Pettit stated that the only reason defendant put the lock on the gate was to protect itself from liability for anyone who might be hurt on the premises and also to, perhaps, charge admission onto the land for field trials. However, he then admitted that once plaintiff had a fight with Dillon and the bank began its foreclosure on the equipment on the land, then the bank did intend to prevent plaintiff from operating his quail-hunting operation.
Another of the bank’s attorneys, Bruce E. Simpson, admitted that he could not recall whether or not he advised the bank that plaintiff could be dispossessed without a court order or legal process.
William L. Brooks, plaintiff’s attorney in the eviction suit against Dillon, testified that he did not find out about the bank’s written assignment until after he had filed suit against Dillon, and he then so advised plaintiff. He also stated that when plaintiff was locked out of the land, he contacted Pettit, and thereafter he was under the impression that plaintiff was not free to go back onto the land.
The trial judge in his written opinion stated:
“It is the opinion of the Court that plaintiff, Luther Lee Carson, had no lease on the property in question until June, 1980, when he leased from McClendon. The assignment of the lease by Dillion (sic) to Central Progressive Bank was duly recorded and, thus, Carson had knowledge of same. No oral lease from Dillion (sic) after the written recorded assignment to the bank could have any effect.
*895 Carson may very well have a valid claim against Dillion (sic), but the Court sees no liability on the part of the bank, other than repayment to Carson of the rental paid to McClendon for the year 197[8]. The bank was lessee during 1978, and any payment made on the lease would be for the benefit of the bank, and would have kept the lease in effect. It would amount to unjust enrichment at the expense of another, if the bank were not required to refund to Carson the $1400.00 he paid McClendon in 1978.”
While we agree with this result, which favored plaintiff, we reach that result on different grounds, and amend as to the award of damages.
Again, the crucial issue is whether the bank followed the required statutory procedure in removing plaintiff from the property. Title XI of the Louisiana Code of Civil Procedure provides the appropriate guidelines for the eviction of tenants and occupants. La.C.C.P. Art. 4702 reads as follows:
“When an owner of immovable property wishes to evict the occupant therefrom, after the purpose of the occupancy has ceased, the owner or his agent, shall first cause a written notice to vacate the property to be delivered to the occupant.
This notice shall allow the occupant five days from its delivery to vacate the premises.”
In La.C.C.P. Art. 4704, “lessees” are included within the definition of “owners.” Thus, defendant was required to follow the provisions of La.C.C.P. Art. 4702, if plaintiff was an “occupant” on the premises. La.C.C.P. Art. 4704 states in pertinent part:
“ ‘Occupant’ includes a sharecropper; half hand; day laborer; former owner; and any person occupying immovable property by permission or accommodation of the owner, former owner, or another occupant, except a mineral lessee, owner of a mineral servitude, or a lessee of the owner; ...” [Emphasis ours]
Óur review of the record shows that the owner was aware of the circumstances surrounding plaintiff’s occupancy of the land; that he gave approval thereto; and that he even accepted a $1,400.00 check from plaintiff for the 1978 rental. Plaintiff was an “occupant,” as he occupied the immovable property by permission and accomodation of the owner. Further, the bank was aware of plaintiff’s presence on the property and even allowed him to operate his business thereon for some time. Pettit testified that he personally gave plaintiff permission to go on the premises at any time, but then admitted that the bank intended to stop his operations after the foreclosure began. See Boisdore v. Intern. City Bank & Tr. Co., 361 So.2d 925 (La.App. 4th Cir.1978), writ denied, 363 So.2d 1384 (La.1978). The action of the bank in locking the gate amounts to a constructive eviction. White v. Board of Sup’rs of Southern University, 365 So.2d 583 (La.App. 1st Cir.1978); Boisdere v. International City Bank, supra. Because the eviction was accomplished without following the proper statutory procedure, it was a wrongful eviction, and defendant is liable in damages. White v. Board of Sup’rs of Southern University, supra, and Rivers v. Tessitore, 165 So.2d 888 (La.App. 4th Cir.1964).
ISSUE NO. 3
Plaintiff has answered this appeal alleging that the trial judge erred in not awarding him damages, other than the $1,400.00 reimbursement for the rent paid to McClendon. When a party uses self-help in preventing occupancy, and does not follow the required legal procedure for eviction, he may be liable in damages. White v. Board of Supr’s of Southern University, supra. Such damages consist of those occurring as a result of the wrongful eviction from the subject property. See Regan v. Carr, 343 So.2d 1125 (La.App. 3rd Cir.1977), writ denied, 346 So.2d 207 (La.1977).
Plaintiff seeks $14,128.53 in damages for general business losses, lost profits on bird sales, lost prepayment fees on hunting contracts, and lost out-of-pocket expenses. He introduced seventeen different hunting contracts which totaled $4,725.00 in prepayment fees for the hunting season (October 1, 1978, until April 30, 1979). He testified that he was required to refund all *896 of these prepaid fees, but he produced no verification of the refunds. These documents did convince us, however, that he intended to conduct a hunting business on the property. The record also indicates that plaintiff purchased 1,500 birds to use in his business, at a cost of $1.75 each; that he had intended to sell the birds for $3.00 each; that after his eviction he sold the birds for less than $3.00 each; and that his total loss on these birds was $1,635.00. This loss is speculative, however, because the hunting contracts apparently include the cost of the birds in the fee.
Plaintiff alleges his out-of-pocket expenses, to be $5,318.53, the largest being his $1,400.00 payment to McClendon for the 1978 rent. He was not evicted until November 17, at which time 44 days remained in 1978. The per-day rental was $3.84, so his loss here amounted to $168.96.[8]
We also note that most of the documentation attached to plaintiff’s exhibits for his out-of-pocket expenses include checks and copies of invoices which are dated as early as May and extending through September and October. We cannot determine which expenses became losses suffered as a direct result of the wrongful eviction. While it is difficult to place an exact mathematical computation on the loss plaintiff suffered, it is obvious that many of these out-of-pocket expenses were incurred in anticipation of the hunting season.
Under all the circumstances and considering all the exhibits and documentary evidence, we find that an award of $5,000.00 in damages will do sufficient justice and will adequately compensate plaintiff for all losses he sustained as a result of this wrongful eviction.
For these reasons, the judgment of the trial court is amended, and there is judgment herein in favor of plaintiff and against defendant for $5,000.00, together with legal interest thereon from date of judicial demand until paid. Defendant is cast for all costs.
AFFIRMED AS AMENDED.

. Plaintiff produced as an exhibit his cancelled check made out to Dr. J.H. McClendon, Sr., which contained a notation stating the check was for “Lease on Property.”

. The bank foreclosed on the loan to Dillon and sold the equipment from the chattel mortgage, which was located on the property. The record reveals that plaintiff purchased some of this equipment and four hunting dogs at the sheriff’s sale. Pettit was the attorney in both the sales.

. It was during this prior suit that plaintiff first became aware of defendant’s written assignment. This was corroborated by plaintiffs attorney in this prior suit, William L. Brooks. Also, we note that Pettit admitted to being present at the hearing involving the eviction suit between plaintiff and Dillon.

. Plaintiff stated that he spoke with Pettit at a field trial held in February, 1979, and that Pettit told him then that he was the one who chained and locked the gate. Pettit testified that he thinks he did lock the gate.

. Plaintiff obtained a second written lease from McClendon, Jr., dated May 31, 1980, and was thereafter able to re-enter the land.

. Plaintiff admitted that he did re-enter the property one time after the lock-out when he attended a field trial in February of 1979, which was open to all members of a certain hunting club. At that time, Pettit gave him a key so he could re-enter the premises to retrieve some items he had left there. Plaintiff stated that he left the key hanging on a little nail right behind the gatepost when he left the property.

. McClendon admitted that his attorney informed him in 1979 that a check made out to him from the bank, dated March 2, 1979, had been received. However, he stated that he refused the check and ordered it sent back.

. The trial judge awarded plaintiff $1,400.00 to reimburse him for the whole year of 1978.