STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-790


CAMILLA JULIANNA FARRAR, ET AL.

VERSUS

LINDA FAYE WHALEY



**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2013-4648
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and John E. Conery, Judges.


**REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.**

**Wilford D. Carter**
**1025 Mill Street**
**Lake Charles, LA 70601**
**(337) 564-6990**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Linda Faye Whaley**

**Annette F. Roach**
**Roach & Roach, APLC**
**724 Moss Street**
**Lake Charles, LA 70601**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Linda Faye Whaley**

**Timothy O'Dowd**
**921 Ryan St., Suite D**
**Lake Charles, LA 70601**
**(337) 310-2304**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
**Camilla Julianna Farrar, et al.**

**EZELL, Judge.**

This appeal involves donations inter vivos made by Joyce Thompson to her caretaker, Linda Whaley. Camilla Farrar, as independent administratrix of Ms. Thompson's succession, filed suit on behalf of the succession against Ms. Whaley for the return of funds and assets she claimed were improperly transferred to Ms. Whaley from Ms. Thompson. Mrs. Farrar is Ms. Thompson's daughter. Ms. Whaley appeals the trial court judgment finding that an automobile was not properly donated to her and ordering her to return cash she withdrew after Ms. Thompson's death, representing the amount of bonds she claims Ms. Thompson donated to her before her death. She also claims the trial court erred in not reimbursing her for the payment of funeral expenses for Ms. Thompson and in assessing all court costs to her.

Mrs. Farrar answered the appeal. Mrs. Farrar argues that the trial court used the wrong standard of review in analyzing the donations and asks that this court perform a de novo review of the testimony and evidence. She claims that the trial court erred in finding that there were multiple valid donations inter vivos of cash to Ms. Whaley. Mrs. Farrar further claims that interest on any of the sums due should run from the date of conversion as opposed to judicial demand.

## FACTS

Ms. Thompson was admitted to Lake Charles Memorial Hospital in May 2012. At that time, Ms. Whaley's husband was working as an orderly at the hospital. Ms. Thompson asked Ms. Whaley's husband if he knew of someone who could take care of her when she got out of the hospital. He informed Ms. Thompson that his wife, who was a certified nursing assistant, could take care of

her. Ms. Whaley began working for Ms. Thompson in June 2012 at the rate of $15.00 an hour.

Ms. Whaley testified that sometime in August 2012, Ms. Thompson promised to leave her all her belongings if she would take care of her because she and her daughter did not get along. On August 24, 2012, a will was typed leaving everything to Ms. Whaley. The will shows the signatures of both Ms. Thompson and Ms. Whaley. Caroline Glenn and Natasha Minor signed the will as witnesses. Ms. Glenn is Ms. Whaley's sister, and Ms. Minor is Ms. Whaley's daughter.

During her deposition, Ms. Whaley testified that one month before the execution of that will, Ms. Thompson wanted her to type a letter which specifically revoked all prior wills, listed her assets, and named Ms. Whaley as power of attorney. However, the content of the letter indicates it was written on October 7, 2012, a month-and-a-half after the will was written. Even more confusing, a separate handwritten page was signed by Ms. Whaley and dated August 24, 2012, indicating she wrote the letter.

A second will with the exact wording and parties' signatures was also purportedly executed on August 24, 2012. Also, another typed letter with the exact wording as the October 2012 letter was also executed. However, this time both the will and letter were notarized by Wanella Gibson on August 24, 2012. It is not disputed that neither the first will nor the second will was sufficient for probate under Louisiana law.

In February 2013, Ms. Thompson went to stay at Resthaven Nursing Home. On May 16, 2013, Ms. Thompson executed a general power of attorney naming Ms. Whaley to act on her behalf. The document was witnessed by Amanda Williams and Shelby Corbett and notarized by Lesa Higginbotham. A second

power of attorney was executed four days later on May 20, 2013, because the first power of attorney was not detailed enough for the banks to allow Ms. Whaley to act on Ms. Thompson's behalf. This power of attorney was notarized by Wanella Gibson and witnessed by Carol Williams and Mary Jackson.

Following Ms. Thompson's admittance to Resthaven Nursing Home, Ms. Whaley claimed that Ms. Thompson made several donations to her in the form of cash, U.S. savings bonds, and a car. Ms. Thompson died on September 5, 2013. Ms. Whaley testified that she did not notify Ms. Thompson's daughter of her death because Ms. Whaley asked her not to. Charles Farrar, Ms. Farrar's husband, testified that he was notified that Ms. Thompson died when an insurance agent called him to inform him that Ms. Whaley was trying to collect insurance that was in his son's name.

Following Ms. Thompson's death, Ms. Farrar was appointed independent administratix of her mother's succession. On October 15, 2013, Ms. Farrar filed a petition for a temporary restraining order, preliminary injunction, and damages against Ms. Whaley seeking the return of assets and funds. A trial was held on December 10 and 11, 2015. The trial court found that any personal, movable items given to Ms. Whaley prior to Ms. Thompson's death were part of a completed donation. The trial court then found that the transfers of cash and bonds after Ms. Thompson's death were not valid and must be returned to her estate. The court further found that there was no evidence of any jewelry or coins in Ms. Thompson's possession at the time of death. Regarding Ms. Thompson's car, the trial court held that transfer of a vehicle must be completed by an authentic act. Since Ms. Thompson did not sign the transfer of title prior to her death, the trial court found that the car was not properly donated to Ms. Whaley.

Ms. Whaley then filed the present appeal contesting some of the trial court's decisions. Ms. Farrar answered the appeal also complaining about the trial court's decisions.

## MOTION TO STRIKE BRIEF

We must first address the motion to strike the appellee's brief in its entirety filed by counsel for Ms. Whaley. She argues that that the brief is both insulting and discourteous, not only toward Ms. Whaley and defense witnesses, but also toward defense counsel, particularly trial counsel, who is not appellate counsel, and the trial judge. Specifically, counsel objects to the repeated use of the terms "forge", "flimsy", and "scripted".

Uniform Rules – Courts of Appeal, Rule 2-12.2(C) provides:

> The language used in the brief shall be courteous, free from vile, obscene, obnoxious, of offensive expressions, and free from insulting, abusive, discourteous, or irrelevant matter or criticism of any person, class of persons or association of persons, or any court, or judge or other officer thereof, or of any institution. Any violation of this Subsection shall subject the author, or authors, of the brief to punishment for contempt of court, and to having such brief returned.

Several of the documents relied upon by Ms. Whaley to prove Ms. Thompson's donative intent were examined by a court-appointed handwriting expert. As will be discussed further in this opinion, it was established that many of these documents appeared to be signed by Ms. Thompson but were actually a forgery of her signature. Even the trial court indicated at trial that it was concerned that Ms. Whaley's testimony and the supporting testimony of her witnesses was fabricated. We do not find Ms. Farrar's brief meets any of the parameters described in Uniform Rules – Courts of Appeal, Rule 2-12.2(C). Therefore, we deny the motion to strike her brief.

4

## STANDARD OF REVIEW

We next address Ms. Farrar's argument that the trial court committed legal error by applying the standard for establishing a donation mortis causa in determining the intentions required for a donation inter vivos. Mrs. Farrar contends that a review of the trial court's reasons for judgment indicates that it considered evidence of Ms. Thompson's intent for donations mortis causa sufficient to establish the intent required for a donation inter vivos.

Mrs. Farrar cites *Butler v. Reddick*, 431 So.2d 396 (La.1983), which held that the burden of establishing a donation inter vivos is on the donee which must be established with strong and convincing evidence. In its reasons for judgment, the trial court stated that "Whaley must show by strong and convincing evidence the donative intent of Ms. [Thompson]." The trial court then goes on further to state that "[i]f it were only a matter of Whaley's testimony as to what Ms. [Thompson] wanted to donate prior to her death, there would not be sufficient evidence. However, combined with verified documentations of her wishes, that evidence may be sufficient."

We find that the trial court used the proper burden of proof in deciding whether there were valid donations inter vivos from Ms. Thompson to Ms. Whaley, proof by clear and convincing evidence. Proof by clear and convincing evidence "requires more than a 'preponderance of the evidence' but less than 'beyond a reasonable doubt.'" *Succession of Wiggins*, 08-63, p. 3 (La.App. 3 Cir. 6/4/08), 984 So.2d 948, 950, *writ denied*, 08-1355 (La. 9/26/08), 992 So.2d 989 (quoting *Succession of Lyons*, 452 So.2d 1161, 1165 (La.1984)). In other words, "[t]he existence of the disputed fact must be highly probable, that is, *much* more probable that is non-existence." *Id.* "This standard is usually employed 'where there is

5

thought to be special danger of deception, or 'where the court considers that the particular type of claim should be disfavored on policy grounds.'" *Id.* Therefore, we will review the trial court's decision under the manifest error standard since donative intent is a factual issue. *Succession of Love*, 16-245 (La.App. 3 Cir. 9/28/16), 201 So.3d 1027.

> [A] trial court's finding on this issue cannot be reversed unless an appellate court, after review of the entire record, finds both that no reasonable factual basis exists for the finding and that it is manifestly erroneous or clearly wrong. *See Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). In applying this standard, a trial court's credibility determinations are entitled to great deference. *Hebert v. Rapides Parish Police Jury*, 06–2001 (La. 4/11/07), 974 So.2d 635 (on rehearing). The reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse even if it is convinced that had it been sitting as trier of fact it would have weighed the evidence differently. *Housley v. Cerise*, 579 So.2d 973 (La.1991). This principle is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

*Id.* at 1030.

## DONATIONS INTER VIVOS

"A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." La.Civ.Code art. 1468. Donations inter vivos are to be made by authentic act unless otherwise permitted by law. La.Civ.Code art. 1541. "The donation inter vivos of a corporeal movable may also be made by delivery of the thing to the donee without any other formality." La.Civ.Code art. 1543.

Mrs. Farrar makes the general argument that there is not clear and convincing evidence that Ms. Thompson intended to make any of the donations to

6

Ms. Whaley. Mrs. Farrar argues that Ms. Whaley relied on her own self-serving testimony and documents that were forged to establish the donative intent of Ms. Thompson. Mrs. Farrar claims this is not sufficient to establish clearly and convincingly that Ms. Thompson intended to make any donations inter vivos to Ms. Whaley.

On February 13, 2014, Mrs. Farrar filed a motion to appoint an expert to examine various documents allegedly signed by Ms. Thompson to determine whether they had been tampered with or notarized subsequent to the signing. After a hearing on the motions, the court appointed Robert Foley, a forensic document examiner and handwriting expert, who testified at trial. His report was introduced into evidence. As part of his examination, he examined the following documents:

1. Original – Last Will and Testament of Joyce E. Thompson, dated August 24, 2012.

2. Original – Last Will and Testament of Joyce E. Thompson dated August 24, 2012.

3. Original – General Power of Attorney, dated May 16, 2013.

4. Original – Power of Attorney, dated May 20, 2013, which was notarized.

5. Photostatic Copy – Vehicle Title, dated July 26, 2013.

6. Photostatic Copy – Affidavit of Error, to show that seller's names shown as the purchaser in error and listing Ms. Whaley as the correct purchaser, dated September 23, 20??. This document was also notarized.

7. Originals of forty-one US Treasury Series EE bonds, redeemed on September 5, 2013.

8. Photostatic Copy – Note 3 lines long, signed by Joyce E. Thompson, dated August 24, 2012, crediting Ms. Whaley for all she did for her.

9. Original handwritten letter on envelope, date referenced in letter as October 7, 2012, unsigned, acknowledging her hospital stay

and all Ms. Whaley did for her, indicating she wants to leave all her belongings to Ms. Whaley.

In addition to offering his conclusions regarding the documents in his report, Mr. Foley also testified at trial. Mr. Foley testified that the first will, which was not notarized, was signed by Ms. Thompson and two witnesses. This will left everything to Ms. Whaley. Mr. Foley further testified that the second will was actually a photocopy of the first will with an original notarial seal added. Mr. Foley explained that the notarial signature had originally been dated August 24, 2013, but then the "3" was changed to a "2". Mr. Foley also found that Ms. Thompson did sign the general power of attorney dated May 16, 2013. Mr. Foley finally concluded that Ms. Thompson did not sign the May 20, 2013 power of attorney, the vehicle title, the affidavit of error nor the forty-nine US Treasury Series EE bonds. We note that the notary who notarized the second-copied will, the May 20, 2013 power of attorney, the vehicle title, and the affidavit of error was the same person. By the time of trial, this notary was deceased. The general power of attorney dated May 16, 2013, was notarized by a different person.

Mr. Foley also found that the two handwritten letters from August and October 2012 did contain Ms. Thompson's signature. Mr. Foley explained he did not have enough comparable handwriting to know whether Ms. Thompson actually wrote the content of the letters.

In its reasons for judgment, the trial court stated:

[W]hile the several documents actually executed by Ms. [Thompson] lack details as to proper/notarization, they do express her interest in giving her possessions to Whaley. If it were only a matter of Whaley's testimony as to what Ms. [Thompson] wanted to donate prior to her death, there would not be sufficient evidence. However, combined with verified documentations of her wishes, that evidence may be sufficient. The Last Will and Testament was signed by Ms. [Thompson] as well as the letter dated October 7, 2012. Both of the

documents demonstrate to the Court Ms. [Thompson's] intent was to give Whaley personal property as well as contents of the home – her movable property. It is very apparent that Whaley recognized that Ms. [Thompson] had little or no fondness for family who, in her mind, had abandoned and neglected her. And, while Whaley quickly took advantage of a lonely, despondent Ms. [Thompson], there was no evidence suggesting that Ms. [Thompson] was of feeble mind. To the contrary, workers from the nursing home, as well as Whaley and her sister, suggested otherwise. Accordingly, any personal, movable items give to Whaley pre-death are part of a completed donation.

Then, in a footnote, the trial court further noted:

It is apparent that Whaley could well have taken a different course in her care of Ms. [Thompson]. However, she chose to play into the woeful state of Ms. [Thompson's] lonely life. The Farrars could well have prevented such an abuse by being more mindful of Ms. [Thompson's] care. It is unconscionable that in the 15 months that Whaley was "caring" for her that they no clue of what Ms. [Thompson] was contemplating nor that she had even been placed in a nursing home prior to her death. An elder woman with the disposable monies and possessions that Ms. [Thompson ] had should have been tended more closely by the family.

Mr. Farrar testified at trial, and Mrs. Farrar testified by video deposition. The Farrars live in Denham Springs. Mrs. Farrar suffers with cerebral palsy and degenerative disc disease which prevents her from traveling in a car for long distances. Mrs. Farrar testified that she and her mother had their ups and downs but they would meet occasionally in Lafayette to eat. Mrs. Farrar called her mother while she was in the hospital. When the Farrars came to Lake Charles for his father's funeral in October 2012, they went by Ms. Thompson's house, but she never came to the door. Mrs. Farrar testified that she continued to try calling but never got an answer. Mr. Farrar did go by during Thanksgiving 2012. They had no idea that she was later placed in a nursing home.

Roger Ryan also testified at trial. Mr. Ryan was paid to take care of Ms. Thompson's yard for over fifteen years. He also ran errands for her. On occasion, he would drive Ms. Thompson to Lafayette to see her daughter. During Hurricane

Rita in 2005, Ms. Thompson's grandson, who was living with her at the time, drove her to the Farrars' house. After the hurricane, Mr. Ryan had to later go get Ms. Thompson due to a disagreement between her and her daughter. Mr. Ryan testified that Ms. Thompson told him that she wanted him to have a lot of her possessions also, just as she told Ms. Whaley. However, Ms. Thompson never gave him anything. Ms. Thompson never told Mr. Ryan that she wanted to disinherit her daughter. He testified that the two had problems, but that was how they got along. Mr. Ryan wanted to visit with Ms. Thompson in the nursing home but he testified that Ms. Whaley told him that Ms. Thompson did not want to see him. Ms. Whaley testified that Ms. Thompson did not trust Mr. Ryan anymore and did not even want him visiting with her at her house.

In her deposition testimony, Ms. Whaley explained that she never made a gift to herself. She further stated that no one was present when Ms. Thompson told her to make gifts to herself. However, at trial, Ms. Whaley testified that she would withdraw money out of Ms. Thompson's bank account and bring it to Ms. Thompson. Ms. Thompson would then gift it to her in front of someone. At trial, Ms. Glenn, Ms. Whaley's sister, stated she saw Ms. Thompson give cash to Ms. Whaley on several occasions. Ms. Whaley explained that in her deposition testimony she thought the question was whether someone witnessed her withdraw the money out of the bank account.

Several employees of Resthaven Nursing Home who worked there as the same time as Ms. Thompson was a resident also testified at trial. Kathleen Dougay, a social worker at the nursing home, testified that Ms. Whaley went to the nursing home on a daily basis, spending the majority of the day with Ms. Thompson. Ms. Thompson told Ms. Dougay that she had no relationship with her family and that

Ms. Whaley was her power of attorney. Ms. Dougay further stated that there was never a question of Ms. Thompson's mental capacity.

Jessica Lake, an LPN at the nursing home, agreed that Ms. Whaley was there pretty much every day. She testified that Ms. Thompson loved Ms. Whaley and that Ms. Thompson told her she did not have a relationship with her daughter.

Layshaone Seymore, activity coordinator at the nursing home, also testified that Ms. Whaley was there almost every day, all day. She agreed that Ms. Thompson admired Ms. Whaley.

There is no doubt that Ms. Thompson relied on Ms. Whaley and expressed a desire to leave personal possessions to Ms. Whaley when the original attempt at a will was executed. However, further testimony casts doubt as to whether she wanted to divest herself of these items *before* she died.

In her deposition testimony, Ms. Whaley testified that she borrowed approximately $9,800.00 from Ms. Thompson to make repairs to her home. At trial, she testified that she borrowed this money around February 2013. In order to pay back Ms. Thompson, Ms. Whaley and Ms. Thompson agreed that Ms. Whaley would receive less money for her weekly services. Mr. Ryan confirmed Ms. Whaley's testimony when he testified that Ms. Whaley told him she got a loan from Ms. Thompson. He further stated that he personally did some repair work on Ms. Whaley's home in 2013.

With this testimony and evidence in mind, we will now address the findings of the trial court regarding the particular donations that the parties complain about on appeal. We will first address Mrs. Farrar's claim that the trial court erred in finding that the donations of cash Ms. Thompson made to Ms. Whaley while she was still alive were valid donations inter vivos.

## Cash Donations

In her answer to the appeal, Ms. Farrar complains about several cash donations that the trial court found Ms. Thompson made to Ms. Whaley while she was still living. At trial, Ms. Whaley testified that she wrote checks and cashed them at the bank. She would then present the cash to Ms. Thompson, who would then hand her back the cash. The trial court found that the cash donations were part of a completed donation inter vivos based on the testimony and evidence introduced at trial. On appeal, Mrs. Farrar argues that we should find that the following withdrawals were not donations and Ms. Whaley should return the funds to the succession:

| May 28, 2013 | $3,850.00 |
| June 25, 2013 | $5,665.66 |
| July 8, 2013 | $1,872.00 |
| August 7, 2013 | $5,000.00 |
| August 14, 2013 | $42,005.90 |
| August 20, 2013 | $12,765.00 |
| August 30, 2013 | $2,760.00 |

Based on the previously discussed testimony and evidence, we disagree with the trial court that there was clear and convincing evidence that Ms. Thompson intended to donate sums of cash to Ms. Whaley before her death.

At trial, Ms. Whaley did testify and offer documentary proof that the withdrawal from Ms. Thompson's account of $12,765.00 on August 20, 2013, was to pay Ms. Thompson's bill at Resthaven. Therefore, we find that this withdrawal was clearly not a donation to Ms. Whaley. However, when questioned about the other withdrawals of cash on May 28, June 25, July 8, August 7, August 14, and

August 30, 2013, Ms. Whaley testified that this was money she personally received from Ms. Thompson.

Ms. Thompson was paid $15.00 an hour when she went to work for Ms. Whaley. However, this amount was reduced to $10.00 an hour when Ms. Whaley began repaying Ms. Thompson for the loan to fix her home. We note that there is no doubt that Ms. Thompson tried to write a will attempting to leave everything to Ms. Whaley at her death, yet money she loaned Ms. Whaley she expected to be paid back while she was still living.

Furthermore, Mr. Ryan worked for Ms. Thompson for many years, with Ms. Thompson also promising to leave him all her possessions when she died. However, she never gave him extra cash. We find it very telling that Ms. Whaley had no witnesses to these cash donations when she testified at her deposition. However, by the time of trial, her sister could corroborate the donations. There is no evidence other than Ms. Whaley's own self-serving testimony along with her sister's sudden trial testimony that Ms. Thompson made these donations of cash. Although employees of Resthaven knew how much Ms. Thompson relied on Ms. Whaley, none of these employees testified that Ms. Thompson made cash donations to Ms. Whaley or even indicated to them that she was giving Ms. Whaley any money.

For these reasons, we find manifest error in the trial court's determination that these six withdrawals were donations inter vivos of cash to Ms. Whaley. Therefore, we reverse the trial court's judgment as to these withdrawals and find Ms. Whaley liable to the succession for the return of $61,153.56.

## Automobile

Ms. Whaley argues that the trial court erred in finding that the donation of Ms. Thompson's automobile was not accomplished prior to her death and awarding the succession $6,000.00, the estimated value of the automobile. The automobile was a 2008 Dodge Caliber. She argues that the trial court erred in concluding that the transfer of the automobile required an authentic act and the actual transfer of the title to complete the donation.

Louisiana Civil Code Article 1543 provides that "[t]he donation inter vivos of a corporeal movable also may be made by delivery of the thing to the donee without any other formality." Relying on the predecessor to this article, La.Civ.Code art. 1539, this court held that the ownership of an automobile between parties can change without transfer of title. *Soileau v. Soileau*, 95-578 (La.App. 3 Cir. 11/2/95), 664 So.2d 551; *Hayden v. Spencer*, 04-1140 (La.App. 3 Cir. 2/2/05), 894 So.2d 551, *writ denied*, 05-982 (La. 6/3/05), 903 So.2d 464.

Therefore, the trial court was incorrect that the transfer of the automobile required an authentic act. Since the trial court's decision was based on its erroneous application of the law, as opposed to a valid exercise of discretion, we are not required to give deference to the trial court's decision. *Watkins v. Lake Charles Mem'l Hosp.*, 12-1320 (La.App. 3 Cir. 4/17/13), 114 So.3d 503, *writ granted*, 13-1137 (La. 9/13/13), 120 So.3d 275, *affirmed*, 13-1137 (La. 3/25/14), 144 So.3d 944. Therefore, we will conduct a de novo review of the facts pertaining to the donation of the automobile. *Id.*

Our review of the facts surrounding the donation of the automobile reveals that Ms. Whaley used the car to run errands for Ms. Thompson and take care of Ms. Thompson's dogs. Ms. Whaley testified that Ms. Thompson came up with the idea

of giving her the car in July of 2013. Ms. Whaley stated that the notary came to the nursing home and the information for transfer of the car was filled out on the back of the title. However, we note that this is one of the documents that Mr. Foley testified did not contain Ms. Thompson's actual signature.

Contrary to Ms. Whaley's testimony, Ms. Glenn testified that she, Ms. Whaley, and Ms. Whaley's daughter picked up Ms. Thompson at the nursing home and took her to the notary's office. They then all signed the vehicle title at the notary's office with Ms. Thompson present.

Based on the evidence and testimony, we cannot say that there was clear and convincing evidence that Ms. Thompson wanted to donate her car in July 2013 to Ms. Whaley. Therefore, while the trial court was incorrect in its application of the law, we do find that the trial court reached the right result in finding that there was not a valid donation inter vivos of the automobile.

Ms. Thompson also argues that Mrs. Farrar presented no evidence to establish the value of the car. The judgment valued the automobile at $6,000.00 based on the value of the automobile listed in the sworn detailed descriptive list prepared on September 12, 2013, in the succession proceedings.

Louisiana Code of Civil Procedure Article 3137 provides that the descriptive list of succession property is prima facie proof of all matters shown in it. Ms. Thompson's entire succession record, including the detailed descriptive list, was introduced into evidence at trial. Ms. Whaley knew the validity of the donation of the car was at issue. Ms. Whaley made no attempt to counter this evidence with any other evidence as to the value of the automobile. Therefore, we find that the trial court was correct in valuing the vehicle at $6,000.00.

## Bonds

Ms. Whaley next argues that the trial court erred in ordering her to return $33,222.34, representing the cash proceeds from the U.S. Series EE bonds that Ms. Thompson gave her. She claims that she provided proof of the completed donation before Ms. Thompson's death.

Ms. Whaley testified that a couple of months before Ms. Thompson died, she told Ms. Whaley to go to the house and get the bonds out of a dresser. In July 2013, bonds in the amount of $5,000.00 were cashed in. The bonds were signed by Ms. Thompson with Ms. Whaley signing as power of attorney. Ms. Whaley testified that she held onto the rest of the bonds. Ms. Whaley got a call around 2:00 a.m. the morning of Ms. Thompson's death that she was being transported to the emergency room at Lake Charles Memorial Hospital. Later that morning, Ms. Whaley attempted to deposit the bonds into her personal bank account, but her bank would not accept the bonds because Ms. Thompson's name was not on the account. Ms. Whaley deposited the savings bond in question valued at $33,222.34 into Ms. Thompson's account at Iberia Bank. Ms. Whaley explained that she signed the remaining bonds as Joyce Thompson, based on the power of attorney executed by Ms. Thompson in her favor. However, she did not sign as Linda Whaley as power of attorney, as she had previously done when the bonds in the amount of $5,000.00 were cashed in. Only the signature of a Joyce Thompson appeared on these bonds. Mr. Foley also testified that Ms. Thompson did not sign these bonds.

The following day after Ms. Thompson died, September 6, 2013, Ms. Whaley withdrew $30,000.00 from Ms. Thompson's account at Iberia Bank. She also withdrew $14,000.00 from another of Ms. Thompson's accounts at a different

bank. Based on these post-death withdrawals, the trial court ordered Ms. Whaley

to return $44,000.00 to the succession.

Federal law and not state law applies to donations inter vivos of United

States savings bonds. *Gaupp v. Tarver*, 691 So.2d 107 (La.App. 1 Cir.), 691 So.2d

107, *writ denied*, 692 So.2d 1093 (La.1997). The first circuit explained the law

applicable to United Savings bonds as follows:

> Article 1, Section 8, Clause 2 of the United States Constitution delegates to the federal government the power "to borrow Money on the credit of the United States." *Free v. Bland*, 369 U.S. at 666–67, 82 S.Ct. at 1092. Pursuant to this grant of power, Congress authorized the Secretary of the Treasury, with the approval of the President of the United States, to issue savings bonds. 31 U.S.C. § 3105(a). That statutory provision also delegates to the Secretary of the Treasury the authority to prescribe rules and regulations controlling the obligations associated with the issuance of United States savings bonds. 31 U.S.C. § 3105(b)(1). The law is clear that United States savings bonds are governed strictly by federal law, and not by state law. *Free v. Bland*, 369 U.S. at 669–70, 82 S.Ct. at 1094; *Succession of Weis*, 162 So.2d 791, 794 (La.App. 4th Cir.1964).

> Savings bonds are issued in registered form only. 31 CFR § 315.5(a). The registration expresses the actual ownership of, and interest in, the savings bond. 31 CFR § 315.5(a). Under 31 CFR § 315.5(a), the registration of ownership is conclusive. Moreover, the only forms recognized by the United States government are single ownership, co-ownership, and beneficiary forms. 31 CFR § 315.7. Savings bonds are not transferable and are payable only to the owners named in the savings bonds. 31 CFR § 315.15.

> A savings bond may be registered in the names of two individuals, in the alternative, as co-owners. 31 CFR § 315.7(b)(2). In such cases, the form of the registration is in the name of one co-owner "or" the other co-owner. A savings bond registered in co-ownership form can be paid to either co-owner upon surrender with an appropriate request, and, upon payment, the other co-owner ceases to have any interest in the bond. 31 CFR § 315.37. If one of the co-owners dies, the surviving co-owner is recognized as the sole and absolute owner of the bond, and payment is made as though the bond were registered in the name of the survivor alone. 31 CFR § 315.70(b)(1).

> A savings bond may also be registered in the name of an individual payable on the death of another. 31 CFR § 315.7(b)(3). The

form of registration is in the name of the owner "**payable on death to** " the beneficiary. A savings bond registered in beneficiary form is paid to the registered owner during his lifetime upon surrender with an appropriate request, and upon payment, the beneficiary ceases to have any interest in the bond. 31 CFR § 315.38. If the owner of a bond registered in beneficiary form dies and is survived by the beneficiary, the beneficiary is recognized as the sole and absolute owner of the savings bond. 31 CFR § 315.70(c)(1).

*Gaupp*, 691 So.2d at 109-10.

The bonds were issued in several different forms, either as a beneficiary form payable upon death to Ariana Farrar, Steven Farrar, or Camilla Farrar. Other bonds were in co-ownership form with the same three people listed on different bonds as the co-owner with Joyce Thompson. Therefore, Ms. Thompson could not accomplish a donation of these bonds by corporeal delivery to Ms. Whaley. For these reasons, the trial court's decision ordering Ms. Whaley to return the $30,000.00 from the proceeds of these bonds was correct.

## FUNERAL EXPENSES

Ms. Whaley further claims that the amount she is ordered to repay should be reduced by the amount she paid in funeral expenses for Ms. Thompson, $7,417.55. She is correct that funeral expenses are debts of the estate and a priority claim against the succession. La.Civ.Code arts. 1415 and 3276. The succession proceedings were introduced into evidence and indicate that Ms. Whaley filed a claim for reimbursement of funeral expenses in that proceeding on May 31, 2016. Therefore, Ms. Whaley's claim for reimbursement of the funeral expenses is more properly addressed in the succession proceedings, and we will not address this issue in the present proceeding.

**INTEREST**

In her answer to the appeal, Mrs. Farrar asked that we amend the judgment to order that interest on the amounts converted by Ms. Whaley run from the date the funds were converted as opposed to date of judicial demand. In her petition, Mrs. Farrar did request that interest run from the date the funds were converted by Ms. Whaley.

Louisiana Code of Civil Procedure Article 1921 provides that "[t]he court shall award interest in the judgment as prayed for or as provided by law." In *Lafleur v. Sylvester*, 135 So.2d 91 (La.App. 3 Cir. 1961), this court recognized that interest on damages for conversion is usually awarded from the day of conversion. Therefore, we agree with Mrs. Farrar that interest on the sums Ms. Whaley was ordered to return should run from the dates of conversion, as well as the sums we find Ms. Whaley must return to the succession. We hereby amend the trial court's judgment to reflect our finding.

**COSTS**

In her final assignment of error, Ms. Whaley claims that the trial court erred in assessing all costs against her. She argues that while the trial court found in favor of Mrs. Farrar as to sums of money removed after Ms. Thompson's death, the trial court rejected her claims regarding any pre-death donations.

Louisiana Code of Civil Procedure 1920 provides that costs shall be paid by the party cast and the trial court may render judgment for costs as it sees equitable. The discretion of the trial court to assess court costs is vast and is not subject to reversal unless there is an abuse of discretion. *Renfro v. Burlington N. Santa Fe Ry. Co.*, 15-372 (La.App. 3 Cir. 5/11/16), 193 So.3d 1192.

19

Since we affirm the decision of the trial court and also find that the trial court erred in finding that the cash donations Ms. Whaley received prior to Ms. Thompson's death were valid donations inter vivos, we find no error in the trial court's assessment of all costs to Ms. Whaley.

For the reasons set forth in this opinion, we reverse the judgment of the trial court which found certain cash donations to Ms. Whaley during Ms. Thompson's lifetime were valid donations inter vivos. We specifically find that the following cash donations were not valid donations vivos and Ms. Whaley is liable to the Succession of Joyce Thompson in these amounts, from the date of conversion: (1) May 28, 2013, in the amount of $3,850.00; (2) June 25, 2013, in the amount of $5,665.66; (3) July 8, 2013, in the amount of $1,872.00; (4) August 7, 2013 in the amount of $5,000.00; (5) August 14, 2013, in the amount of $42,005.90; and (6) August 30, 2013, in the amount of $2,760.00. We affirm the trial court's judgment finding that the donation of the automobile was not a valid donation inter vivos, but amend that judgment to find that interest should run from the date of conversion, September 5, 2013, when Ms. Thompson died. We also affirm the trial court's judgment that the transfer of the U.S. Series EE bonds to Ms. Whaley were not valid donations inter vivos and find that interest should run from the date of conversion, September 6, 2013. Costs of this appeal are assessed to Linda Whaley.

**REVERSED IN PART; AFFIRMED IN PART; AMENDED IN PART; AND RENDERED.**

20